## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ANDRE W. WONG, On Behalf of the T-MOBILE USA, INC. 401(K) RETIREMENT SAVINGS PLAN AND TRUST and On Behalf of All Other Similarly Situated Employee Benefit Plans, | : : : : : : | CIVIL ACTION NO.<br><br>CLASS ACTION COMPLAINT<br><br>JURY DEMANDED |
| Plaintiff, | : : | |
| v. | : : | |
| FMR LLC; FIDELITY MANAGEMENT & RESEARCH COMPANY; FIDELITY MANAGEMENT TRUST COMPANY; FIDELITY BROKERAGE SERVICES LLC; NATIONAL FINANCIAL SERVICES LLC; FIDELITY INVESTMENTS INSTITUTIONAL OPERATIONS COMPANY, INC. and JOHN and JANE DOES 1-10, | : : : : : : : : : : | |
| Defendants. | : : | |

Plaintiff, Andre W. Wong ("Plaintiff"), by and through his undersigned counsel, in support of this Complaint, hereby pleads and avers as follows:

## I.   INTRODUCTION

1.      Personal savings accounts in the form of 401(k) and other defined contribution plans have become the primary method for employees in the United States to save for retirement in recent years.  The importance of defined contribution plans to the United States retirement system has become increasingly pronounced as employer-provided defined benefit ("DB") plans have become increasingly rare as an offered and meaningful employee benefit.

2.      Fidelity (defined below) acts as a recordkeeper, "service provider," a party-in-interest and a fiduciary for thousands of 401(k) plans and similar defined contribution retirement plans (the "Plans," more fully defined below) in the United States.

3.      Fidelity offers the Plans the opportunity to invest in third-party mutual funds and similar investment vehicles through its "FundsNetwork", which Fidelity launched in 1989 and describes as "one of the industry's leading fund supermarkets."  As part of its "Workplace Investing" business unit, Fidelity allows the Plans "to invest in mutual funds from hundreds of fund companies outside of Fidelity," https://www.fidelity.com/mutual-funds/overview, and Fidelity's Workplace Investing business unit provides third-party (i.e., non-Fidelity) mutual funds with access to over 24,000 retirement plans with over $1.6 trillion in assets.

4.      Beginning in or about 2017, Fidelity began requiring various mutual funds, affiliates of mutual funds, mutual fund advisors, sub-advisors, investment funds, including collective trusts, and other investment advisors, instruments or vehicles that are offered to the Plans through Fidelity's FundsNetwork (collectively, "mutual funds"), to make secret payments (the "kickbacks," "kickback payments," or "secret payments") to Fidelity for its own benefit in the guise of "infrastructure" payments or so-called relationship-level fees in violation of, *inter alia*, the prohibited transaction rules of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§1001, *et seq*. (*i.e.*, ERISA §§ 404 and 406, 29 U.S.C. §§ 1104 and 1106), as well as ERISA's fiduciary rules (*i.e.*, ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B)).

5.     The kickback payments at issue are part of a pay-to-play scheme in which Fidelity receives these payments from mutual funds in the event that otherwise disclosed 12b-1 fees, administration fees, service fees, sub-transfer agent fees and/or similar fees ("revenue sharing payments" or "RSPs") fall below a certain level and Fidelity requires payment of these kickbacks in return for providing the mutual funds with access to its retirement plan customers, including its 401(k) plan customers.

6.     Although Fidelity attempts to categorize these secret kickback payments as flat dollar payments, the payments are, in fact, calculated based upon the assets the mutual funds maintain under management [multiplied by designated basis point ("bp") amounts], including the Plans' assets invested in the mutual funds, and are offset by the amount, if any, of revenue sharing payments generated by the assets for which Fidelity provides recordkeeping and related services, including with respect to such services that are provided by Fidelity to the Plans. Although these secret payments clearly constitute indirect compensation that Fidelity is required to disclose to the Plans under ERISA § 408(b)(2), *see also* 29 C.F.R. § 2550.408b-2, Fidelity does not disclose the amount of these secret payments (which amount to at least tens of millions of dollars per annum and likely in the hundreds of millions of dollars per annum) to the Plans and forbids the mutual funds from disclosing the amount of these secret payments, despite their legal obligation to do so.

7.     Fidelity uses its ownership and control of the FundsNetwork to negotiate for the receipt of these kickbacks from mutual funds, and the secret payments have the effect of

increasing the expense ratios and/or other expenses of the mutual funds, which expenses are deducted directly from the assets of the Plans and their participants.  Fidelity is a fiduciary under ERISA by virtue of its discretion and exercise of discretion in negotiating/establishing its own compensation by and through its setting of the amount and receipt of the secret payments.

8.     The kickbacks at issue are based, in whole or in part, on a percentage of the Plans' investments in mutual funds that are delivered to it by Fidelity and/or based on the magnitude of the investments by such Plans in the mutual funds.

9.     While the kickbacks are internally described by Fidelity as "infrastructure payments" and reimbursement for expenses incurred in providing services for, to, or on behalf of the mutual funds, and deceptively characterized as such to Plans and their participants to the extent obliquely referenced by Fidelity as "mutual fund supermarket fees," https://www.fidelity.com/mutual-funds/all-mutual-funds/fees (thereby concealing their true nature), *see also* https://www.fidelity.com/bin-public/060_www_fidelity_com/ documents/brokerage_commissions_fee_schedule.pdf *("Fidelity may receive a fee from unaffiliated product providers to compensate Fidelity for maintaining the infrastructure to accommodate unaffiliated products [and] [t]he fee is a fixed amount that typically equates to less than 0.05% of a product provider's assets in all retail, workplace, and intermediary channels maintained by Fidelity, and does not vary based on a plan's offering of an unaffiliated product supported by Fidelity...."), the amounts of these kickbacks bear absolutely no relationship to the cost or value of any such services and, instead, plainly are a replacement for declining amounts

of revenue sharing payments received by Fidelity as a result of the increasing use of passive mutual funds, institutional and R6 share classes of mutual funds and collective trusts, which pay little or nothing in the way of RSPs.  Fidelity also reserves the right to increase the amount of the kickbacks and to impose them upon mutual funds at its discretion.  As a result of its acceptance of these unlawful, secret payments, Fidelity occupies a conflicted position whereby it effectively operates a system in which it is motivated to increase the amount of such payments, while improperly incentivizing the mutual funds to provide RSPs to Fidelity and/or to conceal the true nature of fees associated with these funds, and requiring the Plans and/or participants who invest in mutual funds and similar investments to unwittingly incur and pay undisclosed fees for the services provided to them.

10.     The services provided by Fidelity that may incidentally benefit mutual funds (beyond pure and simple access to retirement plan customers -- referred to sometimes as pay-to-play, shelf-space or kickback arrangements) are actually services that Fidelity has historically provided to its retirement plan customers as a necessary part of its business in return for fees directly collected by it from such customers, and these fees generally do not change as a result of Fidelity's receipt of the kickbacks from the mutual funds and are not reduced in a manner that corresponds with the amount of the secret kickback payments received.

11.     Fidelity's receipt of the kickback payments at issue violates ERISA's prohibited transaction and fiduciary duty rules and should not be countenanced since the receipt of such payments places Fidelity in a conflicted position in which the interests of its retirement plan

customers can be and are sacrificed in the interest of Fidelity earning greater profits through the receipt of such payments.

12.     As explained below, Fidelity also has engaged in acts of self-dealing with respect to the retirement assets of the Plans (defined below) and the Class (defined below) and, in so doing, also has otherwise violated the prohibited transaction rules of ERISA, as well as ERISA's fiduciary rules.

13.     This is an action for equitable relief and damages under ERISA in which Plaintiff seeks to recover, for the benefit of the 401(k) plans in the Class and all other similarly situated Plans, also known as employee pension benefit plans under ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A) that are subject to Internal Revenue Code Sections 401(a) and 401(k), the kickback payments and other compensation that Fidelity has improperly received.

14.     Plaintiff brings this action on behalf of the Plan (defined below) and on behalf of all other similarly situated Plans under ERISA §§ 409(a) and 502(a) and (g), 29 U.S.C. §§ 1109(a) and 1132(a) and (g), to recover the following relief:

- A declaratory judgment holding that the acts of Defendants (defined below) herein violate ERISA and applicable law;

- A permanent injunction against Defendants prohibiting the practices described herein;

- Disgorgement and/or restitution of all the kickback payments and other compensation improperly received by Fidelity, or, alternatively, the profits earned by Fidelity in connection with its receipt of such payments and other unlawful compensation;

- Compensatory damages;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.    THE PARTIES

15.    Plaintiff is a participant in the T-Mobile USA, Inc. 401(k) Retirement Savings Plan and Trust (the "T-Mobile Plan" or the "Plan").  At all pertinent times, as discussed more fully below, Fidelity acted as a service provider for, a party-in-interest with respect to and a fiduciary of the Plan, as well as all of the Plans.  Plaintiff brings this action in a representative capacity on behalf of the Plan and all other similarly situated Plans.  Plaintiff is a resident of West Covina, Los Angeles County, California.  Fidelity received kickback payments in connection with the investments of Plaintiff and the Plan.

16.    Defendant, FMR LLC, a/k/a Fidelity Management & Research ("FMR"), is a financial services conglomerate headquartered in Boston, Suffolk County, Massachusetts, which operates as the parent entity for Fidelity Investments (defined below) and its associated business enterprises.  At all pertinent times, FMR has controlled and directed the activities of the other Defendants.

17.    Defendant, Fidelity Management & Research Company ("FMR Co."), is a subsidiary of FMR that is headquartered at the same address as FMR in Boston, Suffolk County, Massachusetts, and is a privately owned investment manager that provides certain services to FMR, including acting as the volume submitter sponsor for FMR with respect to certain adoption agreements entered into with the Plans so that Fidelity (defined below) can provide

recordkeeping and fiduciary services to the Plans.

18.     Defendant, Fidelity Management Trust Company ("FM Trust Co."), is a subsidiary of FMR that is headquartered at the same address as FMR in Boston, Suffolk County, Massachusetts, which acts as a trustee and fiduciary with respect to the retirement funds of the Plans and their participants.  FM Trust Co. collects and delivers the retirement assets of the Plans to mutual funds and, in return, the kickbacks at issue are remitted to Fidelity as a condition of the mutual funds maintaining their position as participants in Fidelity's FundsNetwork.

19.     Defendant, Fidelity Brokerage Services LLC ("FBS"), is a subsidiary of FMR that is headquartered at the same address as FMR in Boston, Suffolk County, Massachusetts, and is a registered broker-dealer that makes the mutual funds available to the Plans through the FundsNetwork and collects certain of the kickbacks on behalf of FMR.

20.     Defendant, National Financial Services LLC ("NFS"), is a subsidiary of FMR and affiliate of FBS that is headquartered at the same address as FMR in Boston, Suffolk County, Massachusetts, which also is a registered broker-dealer that makes the mutual funds available to the Plans through the FundsNetwork and collects certain of the kickbacks on behalf of FMR.

21.     Defendant, Fidelity Investments Institutional Operations Company, Inc. ("Fidelity Operations"), is a subsidiary and affiliate of FMR that also maintains offices in Boston, Suffolk County, Massachusetts, and which is the Fidelity entity that provides recordkeeping services to the Plans.

22.     Defendants, John and Jane Does 1-10 ("Doe Defendants"), include additional

Fidelity entities and fiduciaries, the identities of which/whom are not presently known to Plaintiff.  Plaintiff will amend the Complaint to substitute the names of the Doe Defendants within a reasonable period of time after which the identities of these defendants are discovered or revealed to Plaintiff.

23.      FMR, FMR Co., FM Trust Co., FBS, NFS, Fidelity Operations and the Doe Defendants act as an integrated enterprise, as alter egos and agents of each other, and/or as a single/joint employer.  Each of the Defendants is legally responsible for the acts of the others. Unless otherwise noted, FMR, FMR Co., FM Trust Co., FBS, NFS, Fidelity Operations and the Doe Defendants are referred to collectively hereafter as "Fidelity" or "Fidelity Investments" or "Defendants."  At all pertinent times, FMR controlled, directed and supervised the sales and marketing activities of the other Defendants, as well as their employees. At all pertinent times, the employee and labor relations, as well as the compensation and benefit activities and the sales and marketing policies and procedures of Fidelity and all Defendants, including the business practices and decisions related to the kickback payments at issue, have operated from and through the centralized control of FMR.  Fidelity is a fiduciary of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).  Fidelity also is a party-in-interest within the meaning of ERISA Section 3(14), 29 U.S.C. § 1002(14).

### III.   JURISDICTION AND VENUE

24.     Plaintiff seeks relief on behalf of the T-Mobile Plan and all other similarly situated Plans pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under ERISA Section 409, 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

25.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e), 29 U.S.C. § 1132(e).

26.     Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29 U.S.C. § 1132(e) and 28 U.S.C. § 1391, because Fidelity maintains its headquarters and principal place of business in Boston, Massachusetts.

27.     At all pertinent times, Fidelity has conducted its retirement business and the retirement business of all other Fidelity affiliates and entities from its offices in this judicial district in Boston, Massachusetts, which functions as the nerve center for the retirement operations of Fidelity.

### IV.   BACKGROUND FACTS

### A.   The Services That Fidelity Provides To The Plans

28.     At all pertinent times, Fidelity has held itself out and continues to hold itself out to Plaintiff, the Plans and the Class as providing a full array of services, and represents that Fidelity can help design and maintain a long-term retirement strategy for a company and its employees.

29.     As Fidelity explains on its website with respect to retirement services in general for 401(k) plans:

> **Employer 401(k) Plan Services**
>
> For organizations of any size
>
> Fidelity 401(k) Plans
>
> Fidelity's 401(k) services offer everything you need to help you run an efficient, successful retirement plan that attracts and retains key talent and helps your employees prepare for a comfortable retirement. From comprehensive administrative and reporting to support around responsible investment decisions, we partner with you to help build a 401(k) that delivers value — for both your business and your employees.
>
> **Our 401(k) Plan Services for Businesses Can Help You:**
>
> **Stay Current**
>
> Optimize your plan design, manage costs, and understand changing fiduciary duties with insights, resources, and reporting.
>
> ■ Take advantage of plan administration and consulting that helps analyze your plan design, prescribe solutions and measure your progress on an annual basis.
>
> ■ Get coordinated under a single service provider that offers the services you need.
>
> ■ Receive exclusive webcasts, a monthly newsletter, and insights on policies, regulations, and investment issues.
>
> ■ Select from a diversified investment offering and completely open architecture investing platform.
>
> ■ Find solutions, that work best for your business, and benchmark plan success with our investment consulting.

- Get help streamlining plan administration and managing risk.

- Access your plan data 24/7, and eliminate inefficient paperwork with Internet-based reporting tools and our Fidelity Plan Sponsor WebStation® (PSW®).

**Create an Educated Workforce**

Help your employees to achieve financial health and wellness with support from day one.

- Keep employees informed with personalized, targeted communications to help them develop confidence in their decisions and understand next steps.

- Provide participants with valuable support designed to empower them to improve behaviors and encourage them to invest appropriately for their goals.

- Make planning easier with our professional help with choosing investments, our all-in-one lifecycle funds, and managed account services.

- Foster continual learning, starting with investing during enrollment and onboarding, followed by reports that detail action steps, plan updates, and retirement insights.

- Ensure secure access to online account information through our NetBenefits® Web site.

- Let them know they can connect with Fidelity by logging into NetBenefits.com, calling a dedicated phone number, or visiting more than 190 Fidelity Investor Centers nationwide.

Leverage your advisor

Fidelity works with over 135,000 Financial Advisors and more than 6,000 investment firms.

Our exceptional plan administration, customer service and employee engagement

programs integrate seamlessly with your advisors insight and leadership.

So if you work with an advisor today, include them in evaluating all of the advantages Fidelity can provide for you and your employees.

https://workplace.fidelity.com/401k-plans.html .

30.     As of September 30, 2016, Fidelity serviced more than 24,000 defined contributions plans with more than 27 million participants, and administers over $1.6 trillion of assets.

31.     Fidelity describes itself as "the nation's No. 1 recordkeeper of 401(k) retirement savings plans and a leading provider of 403(b) retirement plans for not-for-profit institutions." https://www.fidelity.com/about-fidelity/fidelity-by-numbers/corporate-statistics.

32.     Fidelity's retirement services are provided from a corporate perspective by all of the Defendants, which act in concert with each other. One of Fidelity's most profitable lines of business is providing services associated with retirement and benefit plans.

33.     The retirement plan services Fidelity provides include recordkeeping, compliance, allocation of participant contributions, distribution of account proceeds to departing participants, loan processing and administrations, asset transfers, IRS tax withholding and reporting, provision of benefits illustrations, processing and distribution of benefits and withdrawals, administration of communications with participants, and maintenance of the menu of investment options made available to the Plans.

**B.**     **The Agreements Between The Plans And Fidelity And The Retirement Investments Provided Under Those Agreements**

34.     Pursuant to the terms of Basic Plan Documents and Adoption Agreements, as well as Service Agreements (the "DC Form Contracts") that it provides to and/or enters into with the Plans, Fidelity manages and administers the retirement plan assets of the Plans.  Fidelity enters into these standard form agreements with virtually all of the Plans.

35.     Pursuant to the DC Form Contracts, Fidelity has provided (and continues to provide) investment options to the T-Mobile Plan and other similarly situated Plans.

36.     After entering into one of the DC Form Contracts Group with the Plans, Fidelity is appointed to collect each of the Plans' retirement contributions in a trust and then invests them in the mutual funds through its omnibus trading system on behalf of the Plans.

37.     Fidelity pools the investments of the Plans before collectively investing them in mutual funds and similar investment vehicles.  For each mutual fund offered on the FundsNetwork to the Plans, Fidelity maintains a single omnibus, or so-called "house" account ("Omnibus Account(s)"), to process all trades and maintain all positions of the Plans in the mutual fund.

38.     The Omnibus Accounts (or their sub-accounts) are divided into accumulation units (sometimes referred to as "record units" or "shares") that track the performance of shares of a selected mutual fund investment with the price per accumulation unit calculated by dividing the total value of the assets of the Omnibus Accounts by the number of units in the Omnibus Accounts.

39.     Pursuant to the DC Form Contracts, participants may choose the mutual funds in which their contributions and any matching contributions made by their employers are invested, and Fidelity allocates those contributions to particular Omnibus Accounts or sub-accounts within the Omnibus Accounts that correspond to the chosen mutual funds and the interests of the Plans and their participants in these mutual funds.  In return for the contributions, which are assets of these ERISA-qualified plans, the Plans and their participants receive accumulation units (shares) in the applicable sub-accounts of the Omnibus Accounts, which accumulation units/shares, like the Omnibus Accounts themselves and the sub-accounts, are held and owned by Fidelity.

40.     Fidelity maintains discretion, authority and control over the Omnibus Accounts, the sub-accounts and the accumulation units (shares).

41.     The accumulation units (shares) of the Plans and their participants, which are held by Fidelity, like the Omnibus Accounts and sub-accounts, constitute assets of the Plans.

42.     Based on the combined contributions to the sub-accounts made by all of these Plans and their participants, Fidelity sells and purchases mutual fund shares to hold in the Omnibus Accounts (and receives the kickbacks, in part, in return for these purchases).

43.     The value of one of the Plans' accumulation units (shares) in the Omnibus Account fluctuates based upon the value of the mutual fund shares held within the various sub-accounts.

44.     Pursuant to the DC Form Contracts administered and managed by Fidelity and issued in the name of Fidelity, Fidelity manages the retirement assets of the Plans in the

Omnibus Accounts and serves as legal title owner and holder of the assets in the Omnibus Accounts.  The investments of the T-Mobile Plan and all of the other Plans are held in Omnibus Accounts in the name of Fidelity, which are administered and managed by Fidelity as well.

45.     Fidelity holds, owns, administers, manages and controls the Omnibus Accounts, as well as their sub-accounts, and uses the Omnibus Accounts as a delivery mechanism to purchase and sell shares in the mutual funds.

46.     In return for delivering these funds from the Omnibus Accounts to the mutual funds and providing access to the Plans through its FundsNetwork, Fidelity receives the kickback payments at issue pursuant to the scheme detailed herein.

47.     Fidelity owns and manages the Omnibus Accounts and maintains and exercises discretion and control with respect to the retirement assets in the Omnibus Accounts.  Fidelity is able to influence and control its own compensation derived from the Omnibus Accounts by, among other things, negotiating the terms of the payments that it will receive from the mutual funds in return for being offered to the Plans through the FundsNetwork, including the amount of the kickback payments a issue that are calculated, in part, based on the assets invested in the Omnibus Accounts.  Pursuant to the DC Form Contracts, Fidelity also maintains complete discretion to substitute, eliminate and add mutual funds offered through its FundsNetwork by and through its Omnibus Accounts, as well as to make other investment decisions on behalf of the Plans.

48.     Fidelity makes it clear to mutual funds that, if they refuse to make the secret

payments, they will be restricted in their relationship with Fidelity and Fidelity, *inter alia*, will

not permit a mutual fund to add new funds to the FundsNetwork, will eliminate its existing

mutual funds from the FundsNetwork through a hold and redeem approach, will impose

additional fees on Fidelity's clients that invest in the mutual funds, and will eliminate

opportunities for these mutual funds to grow their business through Fidelity's FundsNetwork and

by providing access to the Plans.

49.     Although Fidelity describes itself as providing an open architecture platform for

the Plans, Fidelity also effectively controls the menu of available mutual funds offered in its

FundsNetwork and retains the discretion to change its fund menus and to not offer certain

investment options to Plans based upon contract pricing and other considerations.

50.     Fidelity asserts that its pricing model and charges to the Plans take into account

so-called revenue sharing payments and similar indirect compensation from mutual funds that

generally is disclosed by Fidelity to the Plans (albeit inadequately).  In stark contrast, Fidelity

hides the existence of the kickback payments at issue from the Plans, in breach of its fiduciary

duties, and explicitly prohibits the mutual funds from disclosing the amount of the kickback

payments.

51.     As a matter of common sense and simple economics, the Plans ultimately pay for

the kickback payments that Fidelity has exacted from the mutual funds and Fidelity has no

defensible basis for concealing the existence of this indirect compensation from the Plans.  The

kickback payments are directly related to the assets of the Plans since (a) they are calculated, in

part, based upon those very assets, and (b) revenue sharing payments associated with the Plans'

assets directly reduce the amount of the kickback payments paid by the mutual funds.

52.     Under ERISA § 406(a), 29 U.S.C. § 1106(a), the fiduciaries of the Plans are

prohibited from causing parties-in-interest (as well as other fiduciaries), including Fidelity, from

entering into arrangements for the provisions of services, such as recordkeeping and other

services provided by Fidelity to the Plans, unless such contract or arrangement is reasonable.

However, Fidelity's failure to disclose the indirect compensation it receives from the mutual

funds renders such arrangements *per se* unreasonable under 29 C.F.R. § 2550-408b-2, thereby

causing the Plans and Fidelity to engage in prohibited transactions in violation of Section 406 of

ERISA.  *See also Harris Trust & Sav. Bank v. Salomon Smith Barney*, 530 U.S. 238

(2000)(holding that even non-fiduciary parties-in-interest can be held liable for participating in

prohibited transactions).

53.     The DC Form Contracts do not meaningfully disclose that the kickback payments

at issue will be made to Fidelity by the mutual funds offered as investments to the Plans or that

Fidelity will utilize the investments in the Omnibus Accounts to generate profits based upon the

existence and leveraging of these assets for Fidelity's own benefit.

### C.     <u>The Plans</u>

54.     At all pertinent times, the T-Mobile Plan was a 401(k) retirement plan and, as of

the date of the filing of this Complaint, it remains a 401(k) retirement plan.  The T-Mobile Plan's

participants, as well as T-Mobile USA, Inc., have funded and continue to fund the Plan.

55.     Through the DC Form Contracts with Fidelity, participants are entitled to invest in various mutual funds selected by Fidelity for inclusion as investment options available to the Plans.

56.     Plaintiff is informed and believes that thousands of qualified ERISA retirement Plans are members of the Class (as defined below), which contracted with Fidelity to provide the same or similar services with respect to the management and administration of the Plans and the disposition, investment and management of these Plans' assets.

**D.      The Relationship Between and Among Class Members, Fidelity and The Mutual Funds**

57.     The employers that are the sponsors and plan administrators of the Plans which compose the Class, engage full-service providers, such as Fidelity, to design and implement the qualified ERISA retirement plans and to provide an entire range of administrative, investment, management and other services necessary to operate them.  Agents of Fidelity solicit business on its behalf on the basis that it is a full-service provider that designs and implements such qualified ERISA retirement plans, and these agents for Fidelity receive commissions for obtaining such business for Fidelity.

58.     In promoting its services, Fidelity claims to be a leading provider for corporate retirement plans that offers a comprehensive array of retirement solutions for its customers.

59.     After setting up qualified ERISA retirement plans such as the Plans, Fidelity provides all of the services necessary for such retirement plans to operate, including recordkeeping, compliance, allocation of participant contributions, distribution of account

proceeds to departing participants, loan processing and administration, asset transfers, IRS tax withholding and reporting, provision of benefits illustrations, processing and distribution of benefits and withdrawals, and administration of communications with participants.

60.     At all pertinent times, Fidelity knew about the material importance of fees and costs to the Plans and their participants, including the amount of any payments that it was receiving from the mutual funds, including the kickback payments at issue.

61.     Mutual funds contract with various entities to perform managerial, administrative, accounting, legal and other services.  Mutual funds pay the entities providing those services, and the mutual funds pass those costs on to their investors by charging them a variety of fees, which are typically referred to as investment management fees, distribution fees, commissions, sub-transfer agency fees, marketing fees, or 12b-1 fees.  Investors thereby effectively pay fees to the mutual funds for these and other services.  The mutual funds generally determine these fees, based on a designated percentage of the net asset value of all of the shares held in the mutual fund, causing the net asset value of all of the shares to decrease by the proportionate percentage attributable to these shares.  As a result of the charging of these fees, by way of example, the value of the mutual fund shares held by Fidelity in the Omnibus Accounts decreases by a corresponding percentage, which, in turn, reduces the value of each of the Plans' and each of the participants in the Plans' accumulation units/shares held by Fidelity in the Omnibus Accounts.

62.     Fidelity retains the discretion, authority and control to delete and add investment options from the Plans' available menu of investments.

63.     Fidelity also retains the right and discretion to unilaterally change its investment management and administrative charges assessed under the Form DC Contracts and in its agreements (sometimes referred to as participation agreements) with the mutual funds.

64.     The mutual funds establish the percentages of the Plans' assets that they charge as fees for their services to cover their normal operating expenses, as well as anticipated profit, and the amount of the kickback payments that they now have been forced to agree to pay to Fidelity.

65.     The secret payments do not bear any relationship to any services performed by Fidelity Operations.  In fact, Fidelity cannot ascribe specific services performed to the receipt of the payments received and, when Fidelity obtains increased kickback payments from mutual funds, it provides no additional services.  Instead, Fidelity literally has lined its pockets with at least hundreds of millions of dollars in secret payments by and through self-dealing, other prohibited transactions and breaches of its fiduciary duties.

66.     As discussed above, in certain materials available to customers, Fidelity has obliquely and deceptively referenced its receipt of the kickback payments as mutual fund "supermarket fees," but has done so in a false and deceptive manner designed to conceal the true nature of these payments.  In referencing such payments, Fidelity has attempted to mask the nature of these kickback payments by falsely and deceptively claiming that the payments relate to the provision of services by Fidelity on behalf of the mutual funds, even though the payments at issue bear no relationship to any services that Fidelity purportedly provides on behalf of the mutual funds.  In addition, although Fidelity has claimed in certain communications that it credits

payments from mutual funds to reduce the amount of payments made by the Plans, Fidelity has

not and does not provide any specific credit to the Plans to account for the kickback payments at

issue (and Fidelity has not calculated or directly attributed the reduction in any fees charged to

the Plans to the actual amount of kickback payments received by Fidelity).  Moreover, Fidelity

never has credited the Plans with the amount of kickback payments it receives on a dollar-for-

dollar basis.  By making false and misleading statements regarding these payments, failing to

disclose the amount of these payments and acting affirmatively to prevent the mutual funds from

disclosing the amount of these payments to the Plans, Fidelity has engaged in acts of fraud and

concealment designed to avoid discovery of its violations of ERISA.  At all pertinent times,

Fidelity's receipt of the kickback payments delineated in this Complaint was fraudulently and

deceptively concealed by Fidelity.

67.     Even assuming *arguendo* that Fidelity contends that it somehow

adequately disclosed the existence and nature of these kickback payments, regardless of how it

obscured such disclosure (or purports to assert that any of the Plans consented to its conduct),

Fidelity's receipt of the kickback payments for its own account is *per se* unlawful and cannot be

excused by alleging that there was any purported disclosure or consent.  Similarly, Fidelity's

receipt of compensation for its own account, by leveraging the assets contained in the Omnibus

Accounts, amounts to self-dealing and the self-payment to Fidelity of unreasonable compensation

through the investment and use of the Plans' retirement assets violates applicable law

(specifically, ERISA).

68.     While effectively keeping the kickback payments a secret from its customers and the Plans, Fidelity regularly negotiates with mutual funds to increase the amount of these payments despite the undesirable impact of increased payments on Plaintiff, the T-Mobile Plan and the Plans.

## V.     CLASS ACTION ALLEGATIONS

69.     This action is brought as a class action by Plaintiff, individually and in a representative capacity on behalf of the Plan and the following proposed Class ("Class"):

> **Class**
>
> All employee pension benefit plans covered by the Employee Retirement Income Security Act of 1974 subject to Internal Revenue Code §§ 401(a) or 401(k) with which Fidelity has maintained a contractual relationship.

Excluded from the Class are Defendants, any employee pension benefit plans for which Defendants' directors, officers or employees are beneficiaries, and any employee pension benefit Plans for which the Judge to whom this case is assigned or any other judicial officer having responsibility for this case is a beneficiary.

70.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

71.     **Numerosity**.  Plaintiff is informed and believes that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

72.     **Commonality**.  There are numerous questions of fact and/or law that are common

to the Plan and all the members of the Class, including, but not limited to the following:

(a)     whether Defendants have acted and continue to act as fiduciaries under ERISA in connection with the conduct described herein;

(b)     whether Defendants have engaged in prohibited transactions by receiving the kickback payments for their own benefit and otherwise earning excessive compensation and effectively charging excessive fees for the administrative, management and investment services they provide to the Plans;

(c)     whether Defendants have breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plans;

(d)     whether Defendants have failed to disclose or inform the Plans of the existence and true nature of the kickback payments, as well as the excessive fees and compensation received by Fidelity;

(e)     whether Defendants are liable for participating in a prohibited transaction by failing to disclose the indirect compensation they receive from mutual funds in violation of 29 C.F.R. § 2550.408b-2; and

(f)     whether and what form of relief should be afforded to Plaintiff and the Class.

73.   **Typicality**.  Plaintiff, who is a representative of the Plan and the Plans, has claims that are typical of all of the members of the Class.  Plaintiff's claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under

the same legal theories that are applicable as to all other members of the Class.

74.     **Adequacy of Representation**.  Plaintiff will fairly and adequately represent the interests of the members of the Class.  Plaintiff has no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiff has retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

75.     **Predominance.**  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar certification.

76.     **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority, if not all, of the Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

77.     **Manageability**.  This case is well suited for treatment as a class action and easily

can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

78.     Defendants have acted on grounds generally applicable to the Class by uniformly subjecting Class members to the kickback scheme and other conduct described above, which scheme Defendants clearly intend to continue to perpetrate in the future.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

<u>**COUNT I**</u>
**(For Breach Of Fiduciary And Violation Of ERISA's Prohibited Transaction Rules)**

79.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

80.     Defendants are fiduciaries of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), as explained above, and are fiduciaries based on their discretion, authority and/or control with respect to the administration, management and/or disposition of the Plans and their assets, and their provision of investment advice for a fee or other compensation with respect to the monies or other property of the Plans and Defendants' authority and responsibility with respect to the administration and management of the Plans and their retirement assets.

81.     Defendants control the selection of the mutual funds available as investment options for the Plans and their participants, provide investment advice for compensation with respect to these investment options, use their custody, control, ownership and dominion over the

Omnibus Accounts and accumulated units of assets of the Plans and use their discretionary authority and responsibility in the administration of the Plans to obtain kickback payments from the mutual funds and to earn other compensation from self-dealing as described above.

82.     Defendants are prohibited from receiving benefits and compensation in connection with their position as fiduciaries of the Plans and a party-in-interest.

83.     The secret payments made by the mutual fund companies to Fidelity constitute Plan assets because: (a) Fidelity receives the payments as a result of its fiduciary status or function (*e.g.*, because Fidelity receives payments from mutual funds in exchange for offering the funds as an investment option to the Plans and their participants); (b) the mutual funds make payments to Fidelity at the expense of the Plans and participants (*e.g.*, because the mutual funds set the fees they charge Plans and participants to cover not only the fees they would normally charge, but also the amount of kickback payments they have to make to Fidelity); and/or (c) the secret payments effectively constitute the proceeds of the Plans' and participants' investments.

84.     Fidelity is a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), with respect to the kickback payments, because it has discretion and control, or exercises authority, with respect to the management or disposition of these payments by arranging for, accepting and retaining them, either directly or through its subsidiaries or affiliates, as well as self-determining its excessive compensation, as described above.

85.     Fidelity has engaged in and continues to engage in prohibited transactions in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by dealing with the

assets of the Plans in its own interest or for its own account.

86.     Fidelity has engaged in and continues to engage in prohibited transactions in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), by acting on behalf of third parties which have interests that are adverse to those interests of the Plans, their participants and/or beneficiaries in connection with transactions involving the Plans.

87.     Fidelity's receipt and retention (or the receipt and/or retention by its affiliates or subsidiaries) of the kickback payments and other compensation, as set forth above, constituted and continues to constitute prohibited transactions under ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), in that the receipt of the kickback payments and other compensation by Fidelity amounts to and constitutes a fiduciary receiving consideration for its own personal account from parties such as mutual funds that are dealing with the Plans in connection with transactions (*i.e.*, the purchase and sale of mutual fund shares) involving the assets of the Plans held in the Omnibus Accounts or sub-accounts, and/or represented by the accumulation units/shares.  Specifically, the mutual funds deal with the Plans by accepting funds from Omnibus Accounts that represent the investment of the Plans' assets, and they do so in connection with transactions involving the assets of the Plans.  Furthermore, as explained above, Fidelity also has engaged in prohibited transactions with respect to its control over the investments in the Omnibus Accounts and its earning of improper and excessive compensation through acts of self-dealing and by acting solely for its own benefit, as opposed to for the benefit of the Plans.

88.     Fidelity also has engaged in and participated in violations of ERISA § 406(a), 29 U.S.C. § 1106(a), by causing the Plans to enter into arrangements with Defendants that are not subject to the safe harbor created by 29 C.F.R. § 2550-408b-2 and, therefore, constitute prohibited transactions.

89.     Pursuant to ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Fidelity is liable to the Plans to credit back, disgorge and/or make restitution of all kickback payments and other improper compensation received by it; or, alternatively, Fidelity is liable to the Plans and the Class to pay damages or make restitution to the Plans in an amount representing the difference between the kickback payments and other compensation that it received, and the reasonable fair market value of any services provided to the Plans by Fidelity.

90.     Plaintiff and the Class also are entitled to all equitable or remedial relief as the Court may deem appropriate and just.

91.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), the Class seeks an Order declaring that the above-described practices of Fidelity in connection with the kickback payments, and its earning of excessive compensation through self-dealing, violate ERISA, as set forth above, and seeks a permanent injunction preventing Fidelity from engaging in such conduct in the future.

## COUNT II
### (For Breach Of Fiduciary Duty)

92.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

93.     Fidelity's arranging for and retention (or the retention by its affiliates or subsidiaries) of the kickback payments, as set forth above, violates its fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), in that Fidelity failed and continues to fail to discharge its duties with respect to the Plans solely in the interest of the Plans' participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plans with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

94.     Fidelity also breached its fiduciary duties by using its discretion and control over or influence with respect to the Omnibus Accounts, as well as their accumulation units/shares, to generate the kickback payments and other improper compensation for its own benefit.  Fidelity did not use the Omnibus Accounts and the accumulation units/shares for the exclusive purpose of providing benefits to the Plans' participants and their beneficiaries and defraying reasonable expenses of administering the Plans and failed to act with the care, skill, prudence and diligence of a prudent person.  As to the kickback payments themselves, to the extent they constitute Plan assets, Fidelity failed to use them for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans and also failed to act with the care, skill, prudence and diligence of a prudent person.  Finally, as set forth above, Fidelity breached its fiduciary duties by earning

excessive compensation for its own account.

95.     As a direct result of Fidelity's breaches of duties, Plaintiff and the Class have suffered losses and damages.

96.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), Fidelity is liable to restore to the Plans the losses they have suffered as a direct result of Fidelity's breaches of fiduciary duty and is liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

<u>**COUNT III**</u>
**(For Co-Fiduciary Breach And Liability For Participation In Prohibited Transactions, Breaches of Fiduciary Duty And Knowing Breaches Of Trust)**

97.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

98.     In the alternative, to the extent that Fidelity is not deemed a fiduciary or co-fiduciary under ERISA, Fidelity is liable to the Class for all recoverable damages and relief as a non-fiduciary and party-in-interest that knowingly participated in prohibited transactions and breaches of fiduciary duty in violation of ERISA, as well as knowing breaches of trust.

WHEREFORE, Plaintiff, on behalf of itself and the Class, demands judgment against Defendants for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502(a)(3), 29 U.S.C. §

1132(a)(3), as detailed above;

      (b)      Disgorgement, restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2);

      (c)      Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

      (d)      Attorneys' fees, costs and other recoverable expenses of litigation; and

      (e)      Such further and additional relief to which Plaintiff and the Class may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all claims so triable.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated: February 21, 2019               Respectfully submitted,

                                    /s/ David Pastor
                                    David Pastor (BBO #391000)
                                    Pastor Law Office
                                    63 Atlantic Avenue, 3rd Floor
                                    Boston, MA 02110
                                      Telephone:  (617) 742-9700
                                      Facsimile:  (617) 742-9701
                                      Email: dpastor@pastorlawoffice.com

James E. Miller
Laurie Rubinow
Shepherd Finkelman Miller
 & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone:  (860) 526-1100
Facsimile:  (866) 300-7367
Email: lrubinow@sfmslaw.com
        jmiller@sfmslaw.com

Ronald S. Kravitz
Kolin C. Tang
Shepherd Finkelman Miller
 & Shah, LLP
201 Filbert Street, Suite 201
San Francisco, CA 94133
Telephone:  (415) 429-5272
Facsimile:  (866) 300-7367
Email: rkravitz@sfmslaw.com
        ktang@sfmslaw.com

Nathan Zipperian
Shepherd Finkelman Miller
 & Shah, LLP
1625 N. Commerce Pkwy Suite 320
Fort Lauderdale, FL 33326
Telephone:  (954) 515-0123
Facsimile:  (866) 300-7367
Email: nzipperian@sfmslaw.com

Chiharu G. Sekino
Jaclyn M. Reinhart
Shepherd Finkelman Miller
 & Shah, LLP
1230 Columbia Street Suite 1140
San Diego, CA 92101
Telephone: (619) 235-2416
Facsimile:  (866) 300-7367
Email: csekino@sfmslaw.com
        jreinhart@sfmslaw.com

Sahag Majarian
Law Offices of Sahag Majarian
18250 Ventura Blvd.
Tarzana, CA 91356
Telephone:  (818) 609-0807
Facsimile:  (818) 609-0892
Email: sahagii@aol.com

***Attorneys for Plaintiff
and the Proposed Class***