## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| *IN RE FIDELITY ERISA FEE LITIGATION* | : | CIVIL ACTION NO. |
| | : | 1:19-CV-10335-LTS |
| | : | |
| | : | **CONSOLIDATED CLASS ACTION** |
| | : | **COMPLAINT** |
| | : | |
| | : | |

Plaintiffs, the Board of Trustees of UFCW Local 23 & Giant Eagle Pension Fund, Janice Andersen, Jason Bailis, Natalie Donaldson, Cynthia Eddy, Myrl Jeffcoat, Thomas Goodrich, Kayla Jones, Karen Pettus, Gina Summers, Andre W. Wong and Heather Woodhouse (collectively, "Plaintiffs"), by and through their undersigned counsel, in support of this Consolidated Complaint ("Complaint"), hereby plead and aver as follows:

### I.    INTRODUCTION

1.      Personal savings accounts in the form of 401(k) and other defined contribution ("DC") plans have become the primary method for employees in the United States to save for retirement in recent years.  The importance of DC plans to the United States retirement system has become increasingly pronounced, as employer-provided defined benefit ("DB") plans have become increasingly rare as an offered and meaningful employee benefit.

2.      DC plans primarily invest in mutual funds that are pooled investment vehicles offered by a registered investment company as defined in the 1940 Investment Companies Act ("'40 Act"), affiliates of mutual funds, collective trusts, separate accounts and other similar instruments or vehicles (collectively, "mutual funds") and DB plans also regularly invest in such

mutual funds.

3.      The Fidelity entities that are named as Defendants in this action (referred to collectively in this Complaint as "Fidelity" and defined below in ¶ 38) act as recordkeepers, "service providers," parties-in-interest and a fiduciaries for thousands of DC and DB plans (the "Plans," more fully defined below) in the United States.

4.      Fidelity offers the Plans the opportunity to invest in third-party mutual funds and similar investment vehicles through its "FundsNetwork," which Fidelity launched in 1989 and describes as "one of the industry's leading fund supermarkets."  As part of its "Workplace Investing" business unit, Fidelity allows the Plans "to invest in mutual funds from hundreds of fund companies outside of Fidelity," *see* https://www.fidelity.com/mutual-funds/overview, and Fidelity's Workplace Investing business unit provides third-party (i.e., non-Fidelity) mutual funds with access to over 24,000 retirement plans with more than $1.6 trillion in assets.

5.      Beginning on or about January 1, 2017, Fidelity began requiring various mutual funds to make secret payments (the "kickbacks," "kickback payments," "secret payments" or "secret kickback payments") to Fidelity for its own benefit in the guise of "infrastructure" payments or so-called relationship-level fees in violation of, *inter alia*, the prohibited transaction rules of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§1001, *et seq*. (*i.e.*, ERISA §§ 404 and 406, 29 U.S.C. §§ 1104 and 1106), as well as ERISA's fiduciary rules (*i.e.*, ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B)).

6.      The kickback payments at issue are part of a pay-to-play scheme in which Fidelity

receives these payments from mutual funds in the event that otherwise disclosed 12b-1 fees, administration fees, service fees, sub-transfer agent fees and/or similar fees ("revenue sharing payments" or "RSPs") fall below a certain level and Fidelity requires payment of these kickbacks in return for providing the mutual funds with access to its retirement plan customers, including the Plans' customers.

7.      Although Fidelity attempts to categorize these secret kickback payments as flat dollar payments, the payments are, in fact, calculated based upon the assets the mutual funds maintain under management [multiplied by designated basis point ("bp") amounts], including the Plans' assets invested in the mutual funds, and are offset by the amount, if any, of revenue-sharing payments generated by the assets for which Fidelity provides recordkeeping and related services, including with respect to such services that are provided by Fidelity to the Plans. Although these secret payments clearly constitute indirect compensation that Fidelity is required to disclose to the Plans under ERISA § 408(b)(2), *see also* 29 C.F.R. § 2550.408b-2, Fidelity does not disclose the amount of these secret payments (which amount to at least tens of millions of dollars per annum and likely in the hundreds of millions of dollars per annum) to the Plans and forbids the mutual funds from disclosing the amount of these secret payments, despite their legal obligation to do so.

8.      Fidelity uses its ownership and control of the FundsNetwork to negotiate for the receipt of these kickbacks from mutual funds, and the secret payments have the effect of increasing the expense ratios and/or other expenses of the mutual funds (in the form of

transaction fees), which expenses are deducted directly from the assets of the Plans and their participants.  Fidelity is a fiduciary under ERISA by virtue of its discretion and exercise of discretion in negotiating/establishing its own compensation by and through its setting of the amount and receipt of the secret payments.

9.      By accepting the kickback payments and concealing their existence and amount from the Plans, Fidelity also self-determines its own compensation, to the detriment of each of the Plans and all of their participants because, pursuant to its contractual relationships with the Plans (discussed more fully below), Fidelity is obligated to credit the amount of all indirect compensation received to the benefit of the Plans.  Since Fidelity conceals the kickback payments and collects these monies on its own account without providing any disclosure to the Plans, the result of Fidelity's secret collection of such kickback payments is that the Plans do not receive the appropriate amount of credit for recordkeeping fees and expenses, and the Plans and each of their participants overpay for recordkeeping fees and expenses, either directly, in the form of increased direct participant fees, or indirectly, through increased expense ratios for the overall menu of investment options offered to the Plans.

10.     Fidelity also holds the discretion to and has exercised the discretion to add, delete and substitute mutual funds from the FundsNetwork, including from the menus of mutual funds available to the Plans.  Indeed, Fidelity has eliminated certain CUSIPs (meaning the alphanumeric code that identifies a North American financial security for the purposes of facilitating clearing and settlement of trades) from the FundsNetwork on the basis that

maintaining those CUSIPs is not profitable for Fidelity.  Moreover, Fidelity adjusts the amount of the kickback payments based upon the number of CUSIPs offered by a mutual fund family to discourage mutual fund complexes from offering larger numbers of CUSIPs (with fund families offering 51 or more CUSIPs being penalized the most).

11.     The kickbacks at issue are based, in whole or in part, on a percentage of the Plans' investments in mutual funds that are delivered to it by Fidelity and/or based on the magnitude of the investments by such Plans in the mutual funds.

12.     While the kickbacks are internally described by Fidelity as "infrastructure payments" and reimbursement for expenses incurred in providing services for, to, or on behalf of the mutual funds, and deceptively characterized as such to Plans and their participants to the extent obliquely referenced by Fidelity as "mutual fund supermarket fees," https://www.fidelity.com/mutual-funds/all-mutual-funds/fees (thereby concealing their true nature), *see also* https://www.fidelity.com/bin-public/060_www_fidelity_com/ documents/brokerage_commissions_fee_schedule.pdf ("Fidelity may receive a fee from unaffiliated product providers to compensate Fidelity for maintaining the infrastructure to accommodate unaffiliated products [and] [t]he fee is a fixed amount that typically equates to less than 0.05% of a product provider's assets in all retail, workplace, and intermediary channels maintained by Fidelity, and does not vary based on a plan's offering of an unaffiliated product supported by Fidelity...."), the amounts of these kickback payments bear absolutely no relationship to the cost or value of any such services and, instead, plainly are a replacement for

declining amounts of revenue-sharing payments received by Fidelity as a result of the increasing use of passive mutual funds, institutional and R6 share classes of mutual funds and collective trusts, which pay little or nothing in the way of RSPs.  Fidelity also reserves the right to increase the amount of the kickback payments and to impose them upon mutual funds at its discretion.  As a result of its acceptance of these unlawful, secret payments, Fidelity occupies a conflicted position whereby it effectively operates a system in which it is motivated to increase the amount of such payments, while improperly incentivizing the mutual funds to provide RSPs to Fidelity and/or to conceal the true nature of fees associated with these funds, and requiring the Plans and/or participants who invest in mutual funds and similar investments to unwittingly incur and pay undisclosed fees for the services provided to them.  In addition, as explained above, because the Plans do not receive the credits that they are due with respect to the indirect payments received by Fidelity, the Plans suffer economic harm because they are unable to use these credits to defray reasonable expenses of the Plans and/or to reduce the expenses charged to participants in the Plans in the form of lower expense ratios or lower direct participant fees.

13.     Indeed, since imposing the requirements that mutual funds make the kickback payments effective January 1, 2017, Fidelity has effectively tripled the amount of the fees charged to mutual funds - first increasing its "fee schedule" by doubling it effective January 1, 2018, and then increasing it by another fifty percent (50%) effective January 1, 2019, all without any notice to the Plans.  Fidelity also imposes a late fee with respect to the kickback payments of one percent (1%) per annum.

14.     The services provided by Fidelity that may incidentally benefit mutual funds
(beyond pure and simple access to retirement plan customers -- referred to sometimes as pay-to-
play or shelf-space arrangements) are actually services that Fidelity has historically provided to
its retirement plan customers as a necessary part of its business in return for fees directly
collected by it from such customers, and these fees generally do not change as a result of
Fidelity's receipt of the kickback payments from the mutual funds and are not reduced in a
manner that corresponds with the amount of the kickback payments received.

15.     Fidelity's receipt of the kickback payments at issue violates ERISA's prohibited
transaction and fiduciary duty rules and should not be countenanced since the receipt of such
payments places Fidelity in a conflicted position in which the interests of its retirement plan
customers can be and are sacrificed in the interest of Fidelity earning greater profits through the
receipt of such payments.

16.     As explained below, Fidelity also has engaged in acts of self-dealing with respect
to the retirement assets of the Plans (defined more fully below) and the Class (defined below)
and, in so doing, also has otherwise violated the prohibited transaction rules of ERISA, as well as
ERISA's fiduciary rules.

17.     This is an action for equitable relief and the recovery of losses under ERISA in
which Plaintiffs seek to recover, for the benefit of the Plans in the Class and all other similarly
situated Plans, also known as employee pension benefit plans under ERISA Section 3(2)(A), 29
U.S.C. § 1002(2)(A), the kickback payments and other compensation that Fidelity has improperly

received and/or retained.

18.     Plaintiffs bring this action on behalf of all other similarly situated Plans under

ERISA §§ 409(a) and 502(a) and (g), 29 U.S.C. §§ 1109(a) and 1132(a) and (g), to recover the

following relief:

- A declaratory judgment holding that the acts of Defendants (defined below) herein violate ERISA and applicable law;

- A permanent injunction against Defendants prohibiting the practices described herein;

- Disgorgement and/or restitution of all the kickback payments and other compensation improperly received or retained by Fidelity, or, alternatively, the profits earned by Fidelity in connection with its receipt of such payments and other unlawful compensation;

- All recoverable losses suffered by the Plans;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.     THE PARTIES

**A.     Plaintiffs**

19.     Plaintiff, the Board of Trustees of the UFCW Local 23 & Giant Eagle Pension

Fund (the "Board"), is a body of trustees and fiduciaries of the UFCW Local 23 & Giant Eagle

Pension Fund (the "UFCW Plan"), which is an employee pension benefit plan within the

meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A).  At all pertinent times, as discussed

more fully below, Fidelity acted as a service provider for, a party-in-interest with respect to and a

fiduciary of the UFCW Plan, as well as all of the Plans.  The Board brings this action in a representative capacity on behalf of the UFCW Plan and all other similarly situated Plans.  The Board is a resident of Wexford, Allegheny County, Pennsylvania.  Fidelity received kickback payments in connection with the investments of the UFCW Plan, and the UFCW Plan was injured by Fidelity's receipt and retention of the kickback payments.

20.     Plaintiff, Janice Andersen ("Andersen"), is or was a participant during the pertinent period in the Select Medical Corporation 401(k) Plan (the "Select Medical Plan"), which is an employee pension benefit plan within the meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A).  At all pertinent times, as discussed more fully below, Fidelity acted as a service provider for, a party-in-interest with respect to and a fiduciary of the Select Medical Plan, as well as all of the Plans.  Andersen brings this action in a representative capacity on behalf of the Select Medical Plan and all other similarly situated Plans.  Andersen is a resident of Sun City, Maricopa County, Arizona.  Fidelity received kickback payments in connection with the investments of the Select Medical Plan, and Andersen and the Select Medical Plan were injured by Fidelity's receipt and retention of the kickback payments.

21.     Plaintiff, Jason Bailis ("Bailis"), is or was a participant during the pertinent period in the Publicis Benefits Connection 401(k) Retirement Savings Plan (the "Publicis Plan"), which is an employee pension benefit plan within the meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A).  At all pertinent times, as discussed more fully below, Fidelity acted as a service provider for, a party-in-interest with respect to and a fiduciary of the Publicis Plan, as well as all

of the Plans.  Bailis brings this action in a representative capacity on behalf of the Publicis Plan and all other similarly situated Plans.  Bailis is a resident of Boca Raton, Palm Beach County, Florida.  Fidelity received kickback payments in connection with the investments in the Publicis Plan, and Bailis and the Publicis Plan were injured by Fidelity's receipt and retention of the kickback payments.

22.     Plaintiff, Natalie Donaldson ("Donaldson"), is or was a participant during the pertinent period in the Hattiesburg Clinic P.A. Savings Plan (the "Hattiesburg Plan"), which is an employee pension benefit plan within the meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A).  At all pertinent times, as discussed more fully below, Fidelity acted as a service provider for, a party-in-interest with respect to and a fiduciary of the Hattiesburg Plan, as well as all of the Plans.  Donaldson brings this action in a representative capacity on behalf of the Hattiesburg Plan and all other similarly situated Plans.  Donaldson is a resident of Hattiesburg, Forrest County, Mississippi.  Fidelity received kickback payments in connection with the investments in the Hattiesburg Plan, and Donaldson and the Hattiesburg Plan were injured by Fidelity's receipt and retention of the kickback payments.

23.     Plaintiff, Cynthia Eddy ("Eddy"), is or was a participant during the pertinent period in the Cadence Health Matched Savings Plan (the "Cadence Plan"), which is an employee pension benefit plan within the meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A).  At all pertinent times, as discussed more fully below, Fidelity acted as a service provider for, a party-in-interest with respect to and a fiduciary of the Cadence Plan, as well as all of the Plans.

Eddy brings this action in a representative capacity on behalf of the Cadence Plan and all other similarly situated Plans.  Eddy is a resident of Green Bay, Brown County, Wisconsin.  Fidelity received kickback payments in connection with the investments in the Cadence Plan, and Eddy and the Cadence Plan were injured by Fidelity's receipt and retention of the kickback payments.

24.     Plaintiff, Myrl C. Jeffcoat ("Jeffcoat"), is or was a participant during the pertinent period in the DST Systems 401(k) Profit Sharing Plan (the "DST Plan"), which is an employee pension benefit plan within the meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A).  At all pertinent times, as discussed more fully below, Fidelity acted as a service provider for, a party-in-interest with respect to and a fiduciary of the DST Plan, as well as all of the Plans. Jeffcoat brings this action in a representative capacity on behalf of the DST Plan and all other similarly situated Plans.  Jeffcoat is a resident of Rancho Cordova, Sacramento County, California. Fidelity received kickback payments in connection with the investments in the DST Plan, and Jeffcoat and the DST Plan were injured by Fidelity's receipt and retention of the kickback payments.

25.     Plaintiff, Thomas Goodrich ("Goodrich"), is or was a participant during the pertinent period in the Alaska Airlines, Inc. Flight Attendants 401(k) Plan which is the successor to the Virgin America 401(k) Plan (the "Virgin Plan"), which is an employee pension benefit plan within the meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A).  At all pertinent times, as discussed more fully below, Fidelity acted as a service provider for, a party-in-interest with respect to and a fiduciary of the Virgin Plan, as well as all of the Plans.  Goodrich brings

this action in a representative capacity on behalf of the Virgin Plan and all other similarly situated Plans.  Goodrich is a resident of Palm Springs, Riverside County, California.  Fidelity received kickback payments in connection with the investments in the Virgin Plan, and Goodrich and the Virgin Plan were injured by Fidelity's receipt and retention of the kickback payments.

26.     Plaintiff, Kayla Jones ("Jones"), is or was a participant during the pertinent period in the Blue Shield of California Tax Deferred Salary Investment Plan (the "Blue Shield Plan"), which is an employee pension benefit plan within the meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A).  At all pertinent times, as discussed more fully below, Fidelity acted as a service provider for, a party-in-interest with respect to and a fiduciary of the Blue Shield Plan, as well as all of the Plans.  Jones brings this action in a representative capacity on behalf of the Blue Shield Plan and all other similarly situated Plans.  Jones is a resident of Stockton, San Joaquin County, California.  Fidelity received kickback payments in connection with the investments in the Blue Shield Plan, and Jones and the Blue Shield Plan were injured by Fidelity's receipt and retention of the kickback payments.

27.     Plaintiff, Karen Pettus ("Pettus"), is or was a participant during the pertinent period in the Maximus, Inc. 401(k) Plan (the "Maximus Plan"), which is an employee pension benefit plan within the meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A).  At all pertinent times, as discussed more fully below, Fidelity acted as a service provider for, a party-in-interest with respect to and a fiduciary of the Maximus Plan, as well as all of the Plans.  Pettus brings this action in a representative capacity on behalf of the Maximus Plan and all other

similarly situated Plans.  Pettus is a resident of Quitman, Wood County, Texas.  Fidelity received

kickback payments in connection with the investments in the Maximus Plan, and Pettus and the

Maximus Plan were injured by Fidelity's receipt and retention of the kickback payments.

28.     Plaintiff, Gina Summers ("Summers"), is or was a participant during the pertinent

period in the Rock Holdings & Associated Companies Savings Plan (the "Rock Holdings Plan"),

which is an employee pension benefit plan within the meaning of ERISA Section 3(2)(A), 29

U.S.C. § 1002(2)(A).  At all pertinent times, as discussed more fully below, Fidelity acted as a

service provider for, a party-in-interest with respect to and a fiduciary of the Rock Holdings Plan,

as well as all of the Plans.  Summers brings this action in a representative capacity on behalf of

the Rock Holdings Plan and all other similarly situated Plans.  Summers is a resident of West

Bloomfield, Oakland County, Illinois.  Fidelity received kickback payments in connection with

the investments in the Rock Holdings Plan, and Summers and the Rock Holdings Plan were

injured by Fidelity's receipt and retention of the kickback payments.

29.     Plaintiff, Andre W. Wong ("Wong"), is or was a participant during the pertinent

period in the T-Mobile USA, Inc. 401(k) Retirement Savings Plan and Trust (the "T-Mobile

Plan"), which is an employee pension benefit plan within the meaning of ERISA Section 3(2)(A),

29 U.S.C. § 1002(2)(A).  At all pertinent times, as discussed more fully below, Fidelity acted as a

service provider for, a party-in-interest with respect to and a fiduciary of the T-Mobile Plan, as

well as all of the Plans.  Wong brings this action in a representative capacity on behalf of the T-

Mobile Plan and all other similarly situated Plans.  Wong is a resident of West Covina, Los

Angeles County, California.  Fidelity received kickback payments in connection with the investments in the T-Mobile Plan, and Wong and the T-Mobile Plan were injured by Fidelity's receipt and retention of the kickback payments.

30.     Plaintiff, Heather Woodhouse ("Woodhouse"), is or was a participant during the pertinent period in the Glacier Bancorp, Inc. Profit Sharing and 401(k) Plan (the "Glacier Plan"), which is an employee pension benefit plan within the meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A).  At all pertinent times, as discussed more fully below, Fidelity acted as a service provider for, a party-in-interest with respect to and a fiduciary of the Glacier Plan, as well as all of the Plans.  Woodhouse brings this action in a representative capacity on behalf of the Glacier Plan and all other similarly situated Plans.  Woodhouse is a resident of Canon City, Fremont County, Colorado.  Fidelity received kickback payments in connection with the investments in the Glacier Plan, and Woodhouse and the Glacier Plan were injured by Fidelity's receipt and retention of the kickback payments.

**B.     <u>Defendants</u>**

31.     Defendant, FMR LLC, a/k/a Fidelity Management & Research ("FMR"), is a financial services conglomerate headquartered in Boston, Suffolk County, Massachusetts, which operates as the parent entity for Fidelity Investments (defined below) and its associated business enterprises.  FMR was known as FMR Corp. until October 1, 2007, at which time it changed its corporate structure from that of a corporation to a privately-held, Delaware limited liability company for legal and strategic reasons.  The Chairman, Chief Executive Officer and a Director

of FMR is Abigail P. Johnson, the granddaughter of Fidelity founder Edward Johnson II. Members of the Johnson family, including Abigail P. Johnson, are the predominant owners (directly or through trusts) of the voting shares/interests of FMR and constitute a controlling group under the '40 Act with respect to FMR.  At all pertinent times, FMR has controlled and directed the activities of the other Defendants.

32.     Defendant, Fidelity Management & Research Company ("FMR Co."), is a subsidiary of FMR that is headquartered at the same address as FMR in Boston, Suffolk County, Massachusetts, and is a privately-owned investment manager and privately-held Massachusetts corporation that provides certain services to FMR, including acting as the volume submitter sponsor for FMR with respect to certain adoption agreements entered into with the Plans so that Fidelity (defined below) can provide recordkeeping and fiduciary services to the Plans.  FMR owns seventy-five percent (75%) or more of FMR Co.

33.     Defendant, Fidelity Management Trust Company ("FM Trust Co."), is a subsidiary of FMR that is headquartered at the same address as FMR and FMR Co. in Boston, Suffolk County, Massachusetts, which acts as a trustee and fiduciary with respect to the retirement funds of the Plans and their participants.  FM Trust Co. is a privately-held Massachusetts corporation that is owned by FMR and collects and delivers the retirement assets of the Plans to mutual funds and, in return, the kickback payments at issue are remitted to and collected by Fidelity as a condition of the mutual funds maintaining their position as participants in Fidelity's FundsNetwork and/or being offered to the Plans as investment options.

34.     Defendant, Fidelity Investments Institutional Operations Company, Inc. ("Fidelity Operations"), is a subsidiary of FMR and an affiliate of FMR Co. and FM Trust Co., which also maintains offices at the same address as FMR, FMR Co. and FM Trust Co. in Boston, Suffolk County, Massachusetts.  Fidelity Operations is a privately-held Massachusetts corporation, is owned by FMR and is the Fidelity entity that provides recordkeeping services to the Plans.

35.     Defendant, Fidelity Brokerage Services LLC ("FBS"), is a subsidiary of FMR that is headquartered at the same address as FMR, FMR Co., FM Trust Co. and Fidelity Operations in Boston, Suffolk County, Massachusetts, and is a registered broker-dealer that makes the mutual funds available to the Plans through the FundsNetwork and collects certain of the kickback payments on behalf of FMR.  FMR owns seventy-five percent (75%) or more of FBS.

36.     Defendant, National Financial Services LLC ("NFS"), is a subsidiary of FMR and affiliate of FBS that is headquartered at the same address as FMR, FMR Co., FM Trust Co., and Fidelity Operations and FBS in Boston, Suffolk County, Massachusetts, which also is a registered broker-dealer that makes the mutual funds available to the Plans through the FundsNetwork and collects certain of the kickbacks and other kickback payments on behalf of FMR.  FMR owns seventy-five percent (75%) or more of NFS.

37.     Defendants, John and Jane Does 1-10 ("Doe Defendants"), include additional Fidelity entities and fiduciaries, the identities of which/whom are not presently known to Plaintiffs.  Plaintiffs will amend the Complaint to substitute the names of the Doe Defendants within a reasonable period of time after which the identities of these defendants are discovered or

revealed to Plaintiffs.

38.     FMR, FMR Co., FM Trust Co., Fidelity Operations, FBS, NFS, and the Doe

Defendants act as an integrated enterprise, as alter egos and agents of each other, and/or as a

single/joint employer.  Each of the Defendants is legally responsible for the acts of the others.

Unless otherwise noted, FMR, FMR Co., FM Trust Co., Fidelity Operations, FBS, NFS, and the

Doe Defendants are referred to collectively hereafter as "Fidelity" or "Fidelity Investments" or

"Defendants."

39.     At all pertinent times, FMR controlled, directed and supervised the sales and

marketing activities of the other Defendants, as well as their employees.  At all pertinent times,

the employee and labor relations, as well as the compensation and benefit activities and the sales

and marketing policies and procedures of Fidelity and all Defendants, including the business

practices and decisions related to the kickback payments at issue herein, have operated from and

through the centralized control of FMR.

40.     Fidelity operates as an integrated financial enterprise through four essential arms:

(a) operations/clearing; (b) workplace services ("WPS") -- which is the Fidelity arm that provides

services directly to the Plans; (c) retail operations; and (d) Fidelity's own mutual fund business.

Each of these business arms report to FMR CEO, Abigail P. Johnson, and individuals within

each business unit work with each other -- despite working for supposedly different business

enterprises -- to promote the singular business objectives and goals of Fidelity.  There is a

notable overlap in management between the different Defendants and many senior managers at

Fidelity hold multiple roles and positions with different Defendants.  In addition, employees of

Fidelity often utilize multiple electronic mail addresses (e.g., @fidelity.com or @fmr.com), all of

which are deposited into the same inbox in recognition of the fact that Fidelity is an integrated

enterprise that functions as a single employer.  All of the Defendants share regional office spaces

around the United States, as well as an integrated technology platform with technical employees

of Fidelity providing support to all Defendants.   All of Defendants' employees also had access to

and utilized an integrated information processing system pursuant to which each of the

Defendants maintained access to the financial and other personal customer information of the

other Defendants.  Finally, employees of each of the Defendants provide services to the Plans by

and through Fidelity's WPS division with each of the Defendants playing a role in the WPS

division in recognition of Fidelity's status as an integrated enterprise.

     41.    As discussed more fully below, Fidelity is a fiduciary of the Plans within the

meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).  Fidelity also is a party-in-

interest within the meaning of ERISA Section 3(14), 29 U.S.C. § 1002(14).

### III.   JURISDICTION AND VENUE

     42.    Plaintiffs seek relief on behalf of all other similarly situated Plans pursuant to

ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and,

specifically, under ERISA Section 409, 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

     43.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and

ERISA Section 502(e), 29 U.S.C. § 1132(e).

44.     Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29

U.S.C. § 1132(e) and 28 U.S.C. § 1391, because Fidelity maintains its headquarters and principal

place of business in Boston, Massachusetts.

45.     At all pertinent times, Fidelity has conducted its retirement business and the

retirement business of all other Fidelity affiliates and entities from its offices in this judicial

district in Boston, Massachusetts, which functions as the nerve center for the retirement

operations of Fidelity.

## IV.     BACKGROUND FACTS

### A.      The Services That Fidelity Provides To The Plans

46.     At all pertinent times, Fidelity has held itself out and continues to hold itself out

to Plaintiffs, the Plans and the Class as providing a full array of services, and represents that

Fidelity can help design and maintain a long-term retirement strategy for a company and its

employees.

47.     As Fidelity explains on its website with respect to retirement services in general

for 401(k) plans:

> **Employer 401(k) Plan Services**
>
> For organizations of any size
>
> Fidelity 401(k) Plans
>
> Fidelity's 401(k) services offer everything you need to help you run
> an efficient, successful retirement plan that attracts and retains key
> talent and helps your employees prepare for a comfortable
> retirement. From comprehensive administrative and reporting to

support around responsible investment decisions, we partner with you to help build a 401(k) that delivers value — for both your business and your employees.

**Our 401(k) Plan Services for Businesses Can Help You:**

**Stay Current**

Optimize your plan design, manage costs, and understand changing fiduciary duties with insights, resources, and reporting.

- Take advantage of plan administration and consulting that helps analyze your plan design, prescribe solutions and measure your progress on an annual basis.

- Get coordinated under a single service provider that offers the services you need.

- Receive exclusive webcasts, a monthly newsletter, and insights on policies, regulations, and investment issues.

- Select from a diversified investment offering and completely open architecture investing platform.

- Find solutions, that work best for your business, and benchmark plan success with our investment consulting.

- Get help streamlining plan administration and managing risk.

- Access your plan data 24/7, and eliminate inefficient paperwork with Internet-based reporting tools and our Fidelity Plan Sponsor WebStation® (PSW®).

**Create an Educated Workforce**

Help your employees to achieve financial health and wellness with support from day one.

- Keep employees informed with personalized, targeted communications to help them develop confidence in their decisions

-20-

and understand next steps.

■ Provide participants with valuable support designed to empower them to improve behaviors and encourage them to invest appropriately for their goals.

■ Make planning easier with our professional help with choosing investments, our all-in-one lifecycle funds, and managed account services.

■ Foster continual learning, starting with investing during enrollment and onboarding, followed by reports that detail action steps, plan updates, and retirement insights.

■ Ensure secure access to online account information through our NetBenefits® Web site.

■ Let them know they can connect with Fidelity by logging into NetBenefits.com, calling a dedicated phone number, or visiting more than 190 Fidelity Investor Centers nationwide.

Leverage your advisor

Fidelity works with over 135,000 Financial Advisors and more than 6,000 investment firms.

Our exceptional plan administration, customer service and employee engagement programs integrate seamlessly with your advisors insight and leadership.

So if you work with an advisor today, include them in evaluating all of the advantages Fidelity can provide for you and your employees.

https://workplace.fidelity.com/401k-plans.html.

48.     Fidelity's WPS division provides the same services to all of the Plans, including

"401(k), 403(b), defined benefit, and nonqualified plans...."   https://www.fidelityworkplace.

com/s/.

49.     As of September 30, 2016, Fidelity serviced more than 24,000 defined

contributions plans with more than 27 million participants, and administered over $1.6 trillion of retirement assets.  As of August 2018, Fidelity administered over $2 trillion in retirement assets. https://www.investmentnews.com/article/20180828/FREE/180829922/fidelity-breaks-through-2-trillion-in-retirement-assets.

50.     Fidelity describes itself as "the nation's No. 1 recordkeeper of 401(k) retirement savings plans and a leading provider of 403(b) retirement plans for not-for-profit institutions." https://www.fidelity.com/about-fidelity/fidelity-by-numbers/corporate-statistics.

51.     Fidelity also provides significant recordkeeping services to DB plans. https://institutional.fidelity.com/app/item/RD_13569_45436.html.

52.     Fidelity's retirement services are provided from a corporate perspective by all of the Defendants, which act in concert with each other.  One of Fidelity's most profitable lines of business is providing services associated with retirement and benefit plans through its WPS division.

53.     The retirement plan services Fidelity provides include recordkeeping, compliance, allocation of participant contributions, distribution of account proceeds to departing participants, loan processing and administrations, asset transfers, IRS tax withholding and reporting, provision of benefits illustrations, processing and distribution of benefits and withdrawals, administration of communications with participants, and maintenance of the menu of investment options made available to the Plans.

**B.      The Agreements Between The Plans And Fidelity, The Retirement Investments
         Provided Under Those Agreements And The Kickback Payments At Issue**

54.      Pursuant to the terms of Basic Plan Documents and Adoption Agreements, as well
as Service Agreements and Trust Agreements (collectively, the "Contracts") that it provides to
and/or enters into with the Plans, Fidelity manages and administers the retirement plan assets of
the Plans.  Fidelity enters into these standard form agreements with virtually all of the Plans.

55.      Pursuant to the Contracts, Fidelity has provided (and continues to provide)
investment options to the Plans.

56.      After entering into one of the Contracts with the Plans, Fidelity is appointed to
collect each of the Plans' retirement contributions in a trust and then invests them in the mutual
funds through its omnibus trading system on behalf of the Plans.

57.      Fidelity pools the investments of the Plans before collectively investing them in
mutual funds and similar investment vehicles.  For each mutual fund offered on the
FundsNetwork to the Plans, Fidelity maintains a single omnibus, or so-called "house" account
("Omnibus Account(s)"), to process all trades and maintain all positions of the Plans in the
mutual fund.

58.      The Omnibus Accounts (or their sub-accounts) are divided into accumulation
units (sometimes referred to as "record units" or "shares") that track the performance of shares of
a selected mutual fund investment with the price per accumulation unit calculated by dividing the
total value of the assets of the Omnibus Accounts by the number of units in the Omnibus
Accounts.

59.     Pursuant to the Contracts, participants, or the Plans' trustees, may choose the mutual funds in which their contributions and any matching contributions are invested, and Fidelity allocates those contributions to particular Omnibus Accounts or sub-accounts within the Omnibus Accounts that correspond to the chosen mutual funds and the interests of the Plans and their participants in these mutual funds.  In return for the contributions, which are assets of these ERISA-qualified plans, the Plans and their participants receive accumulation units (shares) in the applicable sub-accounts of the Omnibus Accounts, which accumulation units/shares, like the Omnibus Accounts themselves and the sub-accounts, are held and owned by Fidelity.

60.     Fidelity maintains discretion, authority and control over the Omnibus Accounts, the sub-accounts and the accumulation units (shares).

61.     The accumulation units (shares) of the Plans and their participants, which are held by Fidelity, like the Omnibus Accounts and sub-accounts, constitute assets of the Plans.

62.     Based on the combined contributions to the sub-accounts made by all of these Plans and their participants, Fidelity sells and purchases mutual fund shares to hold in the Omnibus Accounts (and receives the kickbacks, in part, in return for these purchases).

63.     The value of one of the Plans' accumulation units (shares) in the Omnibus Account fluctuates based upon the value of the mutual fund shares held within the various sub-accounts.

64.     Pursuant to the Contracts administered and managed by Fidelity and issued in the name of Fidelity, Fidelity manages the retirement assets of the Plans in the

Omnibus Accounts and serves as legal title owner and holder of the assets in the Omnibus Accounts.  The investments of the Plans are held in Omnibus Accounts in the name of Fidelity, which are administered and managed by Fidelity as well.

65.     Fidelity holds, owns, administers, manages and controls the Omnibus Accounts, as well as their sub-accounts, and uses the Omnibus Accounts as a delivery mechanism to purchase and sell shares in the mutual funds.

66.     In return for delivering these funds from the Omnibus Accounts to the mutual funds and providing access to the Plans through its FundsNetwork, Fidelity receives the kickback payments at issue pursuant to the scheme detailed herein.

67.     Fidelity owns and manages the Omnibus Accounts and maintains and exercises discretion and control with respect to the retirement assets in the Omnibus Accounts.

68.     Fidelity is able to influence and control its own compensation derived from the Omnibus Accounts by, among other things, negotiating the terms of the payments that it will receive from the mutual funds in return for being offered to the Plans through the FundsNetwork, including the amount of the kickback payments at issue that are calculated, in part, based on the assets invested in the Omnibus Accounts.

69.     Pursuant to the Contracts, Fidelity also maintains complete discretion to substitute, eliminate and add mutual funds offered through its FundsNetwork by and through its Omnibus Accounts, as well as to make other investment decisions on behalf of the Plans. Indeed, Fidelity has exercised the discretion to add, delete and substitute mutual funds from its

FundsNetwork and, when doing so, has failed to provide (a) adequate notice of such addition, deletion or substitution of the mutual funds available to the Plans for investment, (b) adequate notice and opportunity to accept or reject the addition, deletion or substitution of such mutual funds from the menus of investments available to the Plans, and/or (c) full and complete information regarding the full nature of the fees and expenses paid by the mutual funds, including disclosure of the amount of the kickback payments received from the mutual funds.

70.     Fidelity makes it clear to mutual funds that, if they refuse to make the secret payments, they will be restricted in their relationship with Fidelity and Fidelity, *inter alia*, will (a) not permit a mutual fund to add new funds to the FundsNetwork, (b) eliminate its existing mutual funds from the FundsNetwork through a hold and redeem approach, (c) impose additional fees on Fidelity's clients that invest in the mutual funds, and (d) eliminate opportunities for these mutual funds to grow their business through Fidelity's FundsNetwork and by providing access to the Plans.

71.     Although Fidelity describes itself as providing an open architecture platform for the Plans, Fidelity also effectively controls the menu of available mutual funds offered in its FundsNetwork and retains the discretion to change its fund menus and to not offer certain investment options to Plans based upon contract pricing and other considerations.

72.     Fidelity asserts that its pricing model and charges to the Plans take into account so-called revenue sharing payments and similar indirect compensation from mutual funds that generally is disclosed by Fidelity to the Plans (albeit inadequately).  In stark contrast, Fidelity

hides the existence of the kickback payments at issue from the Plans, in breach of its fiduciary duties, and explicitly prohibits the mutual funds from disclosing the amount of the kickback payments.

73.     As a result, although Fidelity is obligated pursuant to the Contracts and on the basis of its pricing model, to credit the Plans with all indirect compensation that it receives from mutual funds, it fails to do so in connection with the kickback payments at issue and, in so doing, the Plans and their participants are harmed by paying higher recordkeeping fees in the form of direct fees and/or higher expense ratios with associated revenue sharing than they otherwise would be required to pay.  The kickback payments also harm the Plans because they are unable to compare the true price of recordkeeping and related expenses between service providers, including Fidelity, because they are not able to obtain full and complete information regarding the compensation being received by Fidelity in connection with the services being performed for the Plans and as a result of the assets that the Plans have invested by and through Fidelity.

74.     As a matter of simple economics, the Plans ultimately pay for the kickback payments that Fidelity has exacted from the mutual funds and Fidelity has no defensible basis for concealing the existence of this indirect compensation from the Plans.  The kickback payments are directly related to the assets of the Plans since (a) they are calculated, in part, based upon those very assets, and (b) revenue sharing payments associated with the Plans' assets directly reduce the amount of the kickback payments paid by the mutual funds.

75.     Fidelity has structured the kickback payments specifically to replace revenue

sharing payments that it otherwise would receive from more expensive actively managed mutual funds, as investors have increasingly chosen to invest in less expensive and passively managed mutual funds that provide less revenue-sharing payments.  The effect of Fidelity requiring the secret kickback payments is that mutual funds are discouraged from offering less expensive share classes of mutual funds on the FundsNetwork and to the Plans since mutual funds know that, if they do not provide adequate revenue sharing payments to Fidelity, they will be required to make undisclosed kickback payments, the amount of which Fidelity maintains the discretion to increase and, in fact, has increased since commencing its kickback payment scheme effective January 1, 2017.

**C.**     **Fidelity's Status As A Fiduciary To The Plans And A Party-In-Interest**

76.     ERISA fiduciaries include any person or entity named as a fiduciary (a "named fiduciary") under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and any other person or entity who perform fiduciary functions (a "functional fiduciary").  A person or entity is a functional fiduciary if "(i) he [she or it] exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he [she or it] renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he [she or it] has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

77.     ERISA defines a "party in interest" to an employee benefit plan to include: (1) "any fiduciary" to such a plan; and (2) a "person providing services to such plan."  ERISA § 3(14), 29 U.S.C. § 1002(14).  ERISA further defines "party in interest" to include (1) "a corporation, partnership, or trust or estate of which (or in which) 50 percent or more of- (i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation, (ii) the capital interest or profits interest of such partnership, or (iii) the beneficial interest of such trust or estate, is owned directly or indirectly or held by persons described in subparagraph (A), (B), (C), (D), or (E)," ERISA § 3(14)(G), 29 U.S.C. § 1002(14)(G); (2) "an employee, officer, director (or an individual having powers or responsibilities similar to those of officers or directors), or a 10 percent or more shareholder directly or indirectly," ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H); and (3) "a 10 percent or more (directly or indirectly in capital or profits) partner or joint venturer of a person described in subparagraph (B), (C), (D), (E), or (G)."  ERISA § 3(14)(I), 29 U.S.C. § 1002(14)(I).

78.     Under ERISA, Fidelity acted as a fiduciary and party-in-interest with respect to the Plans.

79.     Fidelity is a functional fiduciary by virtue of the retirement plan services it provides to the Plans, including the discretion, authority and control it has and exercises with respect to the management and administration of the Plans' assets and investments.

80.     Fidelity manages and administers the retirement plan assets of the Plans pursuant to the terms of agreements it enters into with the Plans, which, among other things, appoint

Fidelity to collect each of the Plans' retirement contributions in a trust and then invest them in the mutual funds through its omnibus trading system pursuant to which Fidelity exercises complete control over the Plans' assets and investments.

81.     Fidelity maintains and exercises complete discretion to substitute, eliminate, and add mutual funds offered to the Plans, as well as to make other investment decisions on behalf of the Plans, and fails to provide the Plans with the required notice and information (and opportunity to effectively opt-out or object with respect to such changes), as required by Department of Labor guidance.

82.     Fidelity also provides discretionary investment management and advisory services to the Plans, including through its affiliates and subsidiaries.

83.     Fidelity exercises discretion to establish, negotiate and self-determine its own compensation for providing recordkeeping and other services to the Plans by, among other things, negotiating increases in its own compensation after entering into the Contracts without notice to the Plans.

84.     Fidelity's fiduciary status and functions with respect to the Plans make it possible for Fidelity to extract from the mutual funds the undisclosed kickback payments at issue in this litigation.

85.     At all pertinent times, Fidelity was a party in interest with respect to the Plans when it sought and accepted the undisclosed kickback payments from mutual funds.

86.     As an ERISA fiduciary, Fidelity is obligated to discharge its duties with respect to

the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose

of providing benefits to the participants and their beneficiaries, and with the care, skill, prudence,

and diligence under the prevailing circumstances that a prudent person, acting in a like capacity

and familiar with such matters, would use in the conduct of an enterprise of a like character and

with like aims.  *See* ERISA § 404(a), 29 U.S.C. § 1104(a).

87.     In light of the substantial potential for abuse, ERISA prohibits certain transactions

with employee savings plans involving fiduciaries and parties-in-interest.

88.     ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) prohibits a fiduciary or party in

interest from causing a plan to engage in a transaction that the fiduciary or party-in-interest

knows would result in a direct or indirect "transfer to, or use by or for the benefit of a party in

interest, of any assets of the plan."

89.     ERISA § 406(b), 29 U.S.C. § 1106(b), further prohibits plan fiduciaries from: (1)

"deal[ing] with the assets of the plan in his own interest or for his own account"; (2) "in his

individual or in any other capacity act[ing] in any transaction involving the plan on behalf of a

party (or represent[ing] a party) whose interests are adverse to the interests of the plan or the

interests of its participants or beneficiaries"; or (3) "receiv[ing] any consideration for his own

personal account from any party dealing with such plan in connection with a transaction

involving the assets of the plan."

90.     Fidelity also is a party in interest because, in additional to its fiduciary status as

detailed above, it provides services to the Plans and their participants, including providing

management, recordkeeping, custodial, administration, and advisory services.

91.     Under ERISA § 406(a), 29 U.S.C. § 1106(a), the fiduciaries of the Plans are prohibited from causing parties-in-interest (as well as other fiduciaries), including Fidelity, from entering into arrangements for the provisions of services, such as recordkeeping and other services provided by Fidelity to the Plans, unless such contract or arrangement is reasonable. However, Fidelity's failure to disclose the indirect compensation it receives from the mutual funds renders such arrangements *per se* unreasonable under 29 C.F.R. § 2550-408b-2, thereby causing the Plans and Fidelity to engage in prohibited transactions in violation of Section 406 of ERISA. *See also Harris Trust & Sav. Bank v. Salomon Smith Barney*, 530 U.S. 238 (2000) (holding that even non-fiduciary parties-in-interest can be held liable for participating in prohibited transactions).

92.     The Contracts do not meaningfully disclose that the kickback payments at issue will be made to Fidelity by the mutual funds offered as investments to the Plans or that Fidelity will utilize the investments in the Omnibus Accounts to generate profits based upon the existence and leveraging of these assets for Fidelity's own benefit.

**D.     The Plans**

93.     Through the Contracts with Fidelity, the Plans and/or their participants are entitled to invest in various mutual funds selected by Fidelity for inclusion as investment options available to the Plans.

94.     Plaintiffs are informed and believe that thousands of qualified ERISA retirement

Plans are members of the Class (as defined below), which contracted with Fidelity to provide the same or similar services with respect to the management and administration of the Plans and the disposition, investment and management of these Plans' assets.

E.   **The Relationship Between and Among Class Members, Fidelity and The Mutual Funds**

95.   The employers that are the sponsors and plan administrators of the Plans which compose the Class, engage full-service providers, such as Fidelity, to design and implement the qualified ERISA retirement plans and to provide an entire range of administrative, investment, management and other services necessary to operate them.  Agents of Fidelity solicit business on its behalf on the basis that it is a full-service provider that designs and implements such qualified ERISA retirement plans, and these agents for Fidelity receive commissions for obtaining such business for Fidelity.

96.   In promoting its services, Fidelity claims to be a leading provider for corporate retirement plans that offers a comprehensive array of retirement solutions for its customers.

97.   After setting up qualified ERISA retirement plans such as the Plans, Fidelity provides all of the services necessary for such retirement plans to operate, including recordkeeping, compliance, allocation of participant contributions, distribution of account proceeds to departing participants, loan processing and administration, asset transfers, IRS tax withholding and reporting, provision of benefits illustrations, processing and distribution of benefits and withdrawals, and administration of communications with participants.

98.   At all pertinent times, Fidelity knew about the material importance

of fees and costs to the Plans and their participants, including the amount of any payments that it was receiving from the mutual funds, including the kickback payments at issue.

99.     Mutual funds contract with various entities to perform managerial, administrative, accounting, legal and other services.  Mutual funds pay the entities providing those services, and the mutual funds pass those costs on to their investors by charging them a variety of fees, which are typically referred to as investment management fees, transaction fees, distribution fees, commissions, sub-transfer agency fees, marketing fees, or 12b-1 fees.  Investors thereby effectively pay fees to the mutual funds for these and other services.  The mutual funds generally determine these fees, based on a designated percentage of the net asset value of all of the shares held in the mutual fund, causing the net asset value of all of the shares to decrease by the proportionate percentage attributable to these shares.  As a result of the charging of these fees, by way of example, the value of the mutual fund shares held by Fidelity in the Omnibus Accounts decreases by a corresponding percentage, which, in turn, reduces the value of each of the Plans' and each of the participants in the Plans' accumulation units/shares held by Fidelity in the Omnibus Accounts.

100.     Fidelity retains the discretion, authority and control to delete and add investment options from the Plans' available menu of investments.

101.     Fidelity also retains the right and discretion to unilaterally change its investment management and administrative charges assessed under the Contracts and in its agreements (sometimes referred to as participation agreements) with the mutual funds.

102.   The mutual funds establish the percentages of the Plans' assets that they charge as fees for their services to cover their normal operating expenses, as well as anticipated profit, and the amount of the kickback payments that they now have been forced to agree to pay to Fidelity.

103.   The secret payments do not bear any relationship to any services performed by Fidelity.  In fact, Fidelity cannot ascribe specific services performed to the receipt of the payments received and, when Fidelity obtains increased kickback payments from mutual funds, it provides no additional services.  Instead, Fidelity literally has lined its pockets with at least hundreds of millions of dollars in secret payments by and through self-dealing, other prohibited transactions and breaches of its fiduciary duties.

104.   As discussed above, in certain materials available to customers, Fidelity has obliquely and deceptively referenced its receipt of the kickback payments as mutual fund "supermarket fees," but has done so in a false and deceptive manner designed to conceal the true nature of these payments.  In referencing such payments, Fidelity has attempted to mask the nature of these kickback payments by falsely and deceptively claiming that the payments relate to the provision of services by Fidelity on behalf of the mutual funds, even though the payments at issue bear no relationship to any services that Fidelity purportedly provides on behalf of the mutual funds.  In addition, although Fidelity has claimed in certain communications that it credits payments from mutual funds to reduce the amount of payments made by the Plans, Fidelity has not and does not provide any specific credit to the Plans to account for the kickback payments at issue (and Fidelity has not calculated or directly attributed the reduction in any fees charged to

the Plans to the actual amount of kickback payments received by Fidelity).  Moreover, Fidelity

never has credited the Plans with the amount of kickback payments it receives on a dollar-for-

dollar basis.  By making false and misleading statements regarding these payments, failing to

disclose the amount of these payments and acting affirmatively to prevent the mutual funds from

disclosing the amount of these payments to the Plans, Fidelity has engaged in acts of fraud and

concealment designed to avoid discovery of its violations of ERISA.  At all pertinent times,

Fidelity's receipt of the kickback payments delineated in this Complaint was fraudulently and

deceptively concealed by it.

105.    Even assuming *arguendo* that Fidelity contends that it somehow

adequately disclosed the existence and nature of these kickback payments, regardless of how it

obscured such disclosure (or purports to assert that any of the Plans consented to its conduct),

Fidelity's receipt of the kickback payments for its own account is *per se* unlawful and cannot be

excused by alleging that there was any purported disclosure or consent.  Similarly, Fidelity's

receipt of compensation for its own account, by leveraging the assets contained in the Omnibus

Accounts and the discretion that it maintains with respect to the FundsNetwork and the mutual

funds made available to the Plans, amounts to self-dealing and the self-payment to Fidelity of

unreasonable compensation through the investment and use of the Plans' retirement assets

violates applicable law (specifically, ERISA).

106.    While effectively keeping the kickback payments a secret from its

customers and the Plans, Fidelity regularly negotiates with mutual funds to increase the amount

of these payments despite the undesirable impact of increased payments on Plaintiffs and the Plans.

## V.    CLASS ACTION ALLEGATIONS

107.    This action is brought as a class action by Plaintiffs in their representative capacities on behalf of the Plans and the following proposed Class ("Class"):

> **Class**
>
> All participants, fiduciaries and beneficiaries of all employee pension benefit plans covered by the Employee Retirement Income Security Act of 1974 with which Fidelity has maintained a contractual relationship.

Excluded from the Class are those Plans for which Fidelity has not and does not receive any kickback payments, as well as Defendants, any employee pension benefit plans for which Defendants' directors, officers or employees are beneficiaries, and any employee pension benefit Plans for which the Judge to whom this case is assigned or any other judicial officer having responsibility for this case is a beneficiary.

108.    This action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2) and (b)(3).

109.    **Numerosity**.  Plaintiffs are informed and believe that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

110.    **Commonality**.  There are numerous questions of fact and/or law that are common to the Plans and all the members of the Class, including, but not limited to the following:

(a)      whether Defendants have acted and continue to act as fiduciaries under ERISA in connection with the conduct described herein;

(b)      whether Defendants have engaged in prohibited transactions by receiving the kickback payments for their own benefit and otherwise earning excessive compensation and effectively charging excessive fees for the administrative, management and investment services they provide to the Plans;

(c)      whether Defendants have breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plans;

(d)      whether Defendants have failed to disclose or inform the Plans of the existence and true nature of the kickback payments, as well as the excessive fees and compensation received by Fidelity;

(e)      whether Defendants are liable for participating in a prohibited transaction by failing to disclose the indirect compensation they receive from mutual funds, in violation of 29 C.F.R. § 2550.408b-2; and

(f)      whether and what form of relief should be afforded to Plaintiffs and the Class.

111.   **Typicality**.  Plaintiffs, who are representatives of the Plans, have claims that are typical of all of the members of the Class.  Plaintiffs' claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.

112.   **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent the interests of the members of the Class.  Plaintiffs have no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiffs have retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

113.   **Predominance.**  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of losses recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar certification.

114.   **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority, if not all, of the Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

115.   **Manageability**.  This case is well suited for treatment as a class action and easily

can be managed as a class action since evidence of both liability and losses suffered can be adduced, and proof of liability and losses can be presented, on a Class-wide basis, while the allocation and distribution of losses to Class members would be essentially a ministerial function.

116.    Defendants have acted on grounds generally applicable to the Class by uniformly subjecting Class members to the kickback scheme and other conduct described above, which scheme Defendants clearly intend to continue to perpetrate in the future.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

## COUNT I
**(For Breach Of Fiduciary Duty And Violation Of ERISA's Prohibited Transaction Rules)**
**(ERISA § 406(b), 29 U.S.C. § 1106(b))**

117.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

118.    Defendants are fiduciaries of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), as explained above, and are fiduciaries based on their discretion, authority and/or control with respect to the administration, management and/or disposition of the Plans and their assets, and their provision of investment advice for a fee or other compensation with respect to the monies or other property of the Plans and Defendants' authority and responsibility with respect to the administration and management of the Plans and their retirement assets.

119.    Defendants control the selection of the mutual funds available as investment

options for the Plans and their participants, provide investment advice for compensation with respect to these investment options, use their custody, control, ownership and dominion over the Omnibus Accounts and accumulated units of assets of the Plans, and use their discretionary authority and responsibility in the administration of the Plans to obtain kickback payments from the mutual funds and to earn other compensation from self-dealing, as described above.

120.    Defendants are prohibited from receiving benefits and compensation in connection with their position as fiduciaries of the Plans and as parties-in-interest.

121.    The secret payments made by the mutual fund companies to Fidelity constitute Plan assets because: (a) Fidelity receives the payments as a result of its fiduciary status or function (*e.g.*, because Fidelity receives payments from mutual funds in exchange for offering the funds as an investment option to the Plans and their participants); (b) the mutual funds make payments to Fidelity at the expense of the Plans and participants (*e.g.*, because the mutual funds set the fees they charge Plans and participants to cover not only the fees they would normally charge, but also the amount of kickback payments they have to make to Fidelity); and/or (c) the secret payments effectively constitute the proceeds of the Plans' and participants' investments.

122.    Fidelity is a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), with respect to the kickback payments, because it has discretion and control, or exercises authority, with respect to the management or disposition of these payments by arranging for, accepting and retaining them, either directly or through its subsidiaries or affiliates, as well as self-determining its excessive compensation, as described above.

123.   Fidelity has engaged in and continues to engage in prohibited transactions, in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by dealing with the assets of the Plans in its own interest or for its own account.

124.   Fidelity has engaged in and continues to engage in prohibited transactions in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), by acting on behalf of third parties which have interests that are adverse to those interests of the Plans, their participants and/or beneficiaries in connection with transactions involving the Plans.

125.   Fidelity's receipt and retention (or the receipt and/or retention by its affiliates or subsidiaries) of the kickback payments and other compensation, as set forth above, constituted and continues to constitute prohibited transactions under ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), in that the receipt of the kickback payments and other compensation by Fidelity amounts to and constitutes a fiduciary receiving consideration for its own personal account from parties such as mutual funds that are dealing with the Plans in connection with transactions (*i.e.*, the purchase and sale of mutual fund shares) involving the assets of the Plans held in the Omnibus Accounts or sub-accounts, and/or represented by the accumulation units/shares. Specifically, the mutual funds deal with the Plans by accepting funds from Omnibus Accounts that represent the investment of the Plans' assets, and they do so in connection with transactions involving the assets of the Plans.  Furthermore, as explained above, Fidelity also has engaged in prohibited transactions with respect to its control over the investments in the Omnibus Accounts and its earning of improper and excessive compensation through acts of self-dealing and by

acting solely for its own benefit, as opposed to for the benefit of the Plans.

126.     Pursuant to ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a),

Fidelity is liable to the Plans to credit back, disgorge and/or make restitution of all kickback

payments and other improper compensation received by it; or, alternatively, Fidelity is liable to

the Plans and the Class to pay the losses suffered or make restitution to the Plans in an amount

representing the difference between the kickback payments and other compensation that it

received, and the reasonable fair market value of any services provided to the Plans by Fidelity.

127.     Plaintiffs and the Class also are entitled to all equitable or remedial relief as the

Court may deem appropriate and just.

128.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), the Class seeks an Order

declaring that the above-described practices of Fidelity in connection with the kickback

payments, and its earning of excessive compensation through self-dealing, violate ERISA, as set

forth above, and seeks a permanent injunction preventing Fidelity from engaging in such conduct

in the future.

### COUNT II
**(For Breach Of Fiduciary Duty And Violation Of ERISA's Prohibited Transaction Rules)**
**(ERISA § 406(a), 29 U.S.C. § 1106(a))**

129.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint

as if fully set forth herein.

130.     Defendants are fiduciaries of the Plans under ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(a), as explained above, and are fiduciaries based on their discretion, authority and/or

control with respect to the administration, management and/or disposition of the Plans and their assets, and their provision of investment advice for a fee or other compensation with respect to the monies or other property of the Plans and Defendants' authority and responsibility with respect to the administration and management of the Plans and their retirement assets.

131.    Defendants control the selection of the mutual funds available as investment options for the Plans and their participants, provide investment advice for compensation with respect to these investment options, use their custody, control, ownership and dominion over the Omnibus Accounts and accumulated units of assets of the Plans and use their discretionary authority and responsibility in the administration of the Plans to obtain kickback payments from the mutual funds and to earn other compensation from self-dealing as described above.

132.    Defendants are prohibited from receiving benefits and compensation in connection with their position as fiduciaries of the Plans and a party-in-interest.

133.    The secret payments made by the mutual fund companies to Fidelity constitute Plan assets because: (a) Fidelity receives the payments as a result of its fiduciary status or function (*e.g.*, because Fidelity receives payments from mutual funds in exchange for offering the funds as an investment option to the Plans and their participants); (b) the mutual funds make payments to Fidelity at the expense of the Plans and participants (*e.g.*, because the mutual funds set the fees they charge Plans and participants to cover not only the fees they would normally charge, but also the amount of kickback payments they have to make to Fidelity); and/or (c) the secret payments effectively constitute the proceeds of the Plans' and participants' investments.

134.    Fidelity is a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), with respect to the kickback payments, because it has discretion and control, or exercises authority, with respect to the management or disposition of these payments by arranging for, accepting and retaining them, either directly or through its subsidiaries or affiliates, as well as self-determining its excessive compensation, as described above.

135.    Fidelity  has engaged in and participated in violations of ERISA § 406(a), 29 U.S.C. § 1106(a), by causing the Plans to enter into arrangements with Defendants that are not subject to the safe harbor created by 29 C.F.R. § 2550-408b-2 and, therefore, constitute prohibited transactions.

136.    Pursuant to ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Fidelity is liable to the Plans to credit back, disgorge and/or make restitution of all kickback payments and other improper compensation received by it; or, alternatively, Fidelity is liable to the Plans and the Class to pay the losses suffered or make restitution to the Plans in an amount representing the difference between the kickback payments and other compensation that it received, and the reasonable fair market value of any services provided to the Plans by Fidelity.

137.    Plaintiffs and the Class also are entitled to all equitable or remedial relief as the Court may deem appropriate and just.

138.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), the Class seeks an Order declaring that the above-described practices of Fidelity in connection with the kickback payments, and its earning of excessive compensation through self-dealing, violate ERISA, as set

forth above, and seeks a permanent injunction preventing Fidelity from engaging in such conduct in the future.

**COUNT III**
**(For Breach Of Fiduciary Duty)**

139.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

140.    Fidelity's arranging for and retention (or the retention by its affiliates or subsidiaries) of the kickback payments, as set forth above, violates its fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), in that Fidelity failed and continues to fail to discharge its duties with respect to the Plans solely in the interest of the Plans' participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plans with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

141.    Fidelity also breached its fiduciary duties by using its discretion and control over or influence with respect to the Omnibus Accounts, as well as their accumulation units/shares, to generate the kickback payments and other improper compensation for its own benefit.  Fidelity did not use the Omnibus Accounts and the accumulation units/shares for the exclusive purpose of providing benefits to the Plans' participants and their beneficiaries and defraying reasonable expenses of administering the Plans and failed to act with the care, skill, prudence and diligence

of a prudent person.  As to the kickback payments themselves, to the extent they constitute Plan assets, Fidelity failed to use them for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans and also failed to act with the care, skill, prudence and diligence of a prudent person.  Finally, as set forth above, Fidelity breached its fiduciary duties by earning excessive compensation for its own account.

142.   As a direct result of Fidelity's breaches of duties, Plaintiffs and the Class have suffered losses.

143.   Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), Fidelity is liable to restore to the Plans the losses they have suffered as a direct result of Fidelity's breaches of fiduciary duty and is liable for the losses suffered and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, as well as attorneys' fees, costs and other recoverable expenses of litigation.

<u>**COUNT IV**</u>
**(For Co-Fiduciary Breach of Duty And Liability For Participation In Prohibited Transactions)**

144.   Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

145.   All of the Defendants operated under common control and acted as co-fiduciaries of the other Defendants.

146.   As a result, each of the Defendants is liable as a co-fiduciary under ERISA for the

breaches of the other Defendants to the extent that liability cannot otherwise be directly imputed

to any of the Defendants.

## COUNT V
**(For Non-Fiduciary Breach of Duty And Liability For Knowing Participation In Prohibited Transactions, Breaches of Fiduciary Duty And/Or Knowing Breaches Of Trust)**

147.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint

as if fully set forth herein.

148.     In the alternative, to the extent that any of the Defendants is not deemed a

fiduciary or co-fiduciary under ERISA, and since each of the Defendants operated under common

control with knowledge of all Defendants imputed to the other Defendants, any of the Defendants

that is not deemed liable as a fiduciary or co-fiduciary is liable to the Class under ERISA for all

recoverable losses and relief as a party-in-interest or other non-fiduciary that knowingly

participated in prohibited transactions and breaches of fiduciary duty in violation of ERISA, as

well as in knowing breaches of trust.

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, demand judgment

against Defendants for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502(a)(3), 29 U.S.C. §

1132(a)(3), as detailed above;

(b)     Disgorgement, restitution and/or other recoverable losses as set forth above, plus

all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§

409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2);

(c)    Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)    Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)    Such further and additional relief to which Plaintiffs and the Class may be justly entitled and the Court deems appropriate and just under all of the circumstances.

**<u>NOTICE PURSUANT TO ERISA § 502(h)</u>**

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Consolidated Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated: May 15, 2019                    Respectfully submitted,

/s/ David Pastor
David Pastor (BBO #391000)
Pastor Law Office, LLP
63 Atlantic Avenue, 3rd Floor
Boston, MA 02110
Telephone: (617) 742-9700
Facsimile: (617) 742-9701
Email: dpastor@pastorlawoffice.com

James E. Miller
Laurie Rubinow
Shepherd Finkelman Miller
 & Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: lrubinow@sfmslaw.com
         jmiller@sfmslaw.com

Ronald S. Kravitz
Kolin C. Tang
Shepherd Finkelman Miller
 & Shah, LLP
201 Filbert Street, Suite 201
San Francisco, CA 94133
Telephone: (415) 429-5272
Facsimile: (866) 300-7367
Email: rkravitz@sfmslaw.com
        ktang@sfmslaw.com

Nathan Zipperian
Shepherd Finkelman Miller
 & Shah, LLP
1625 N. Commerce Pkwy Suite 320
Fort Lauderdale, FL 33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367
Email: nzipperian@sfmslaw.com

Chiharu G. Sekino
Jaclyn M. Reinhart
Shepherd Finkelman Miller
 & Shah, LLP
1230 Columbia Street Suite 1140
San Diego, CA 92101
Telephone: (619) 235-2416
Facsimile: (866) 300-7367
Email: csekino@sfmslaw.com
        jreinhart@sfmslaw.com

Sahag Majarian
Law Offices of Sahag Majarian
18250 Ventura Blvd.
Tarzana, CA 91356
Telephone: (818) 609-0807
Facsimile: (818) 609-0892
Email: sahagii@aol.com

Daniel E. Bacine
Mark R. Rosen
Barrack, Rodos & Bacine
2001 Market Street, Suite 3300
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
Email: dbacine@barrack.com
        mrosen@barrack.com

Jeffrey Block
Block & Leviton LLP
155 Federal Street, Suite 400
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
Email: jblock@blockesq.com

R. Joseph Barton (*pro hac vice to be filed*)
Block & Leviton LLP
1735 20th St NW,
Washington DC 20009
Telephone: (202) 734-7046
Email: jbarton@blockesq.com

Dena C. Sharp
Adam E. Polk
Elizabeth A. Kramer (*pro hac vice to be filed*)
Girard Sharp LLP
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: dsharp@girardsharp.com
        apolk@girardsharp.com
        ekramer@girardsharp.com

***Attorneys for Plaintiffs
and the Proposed Class***