UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re Fidelity ERISA Fee Litigation* | Civil Action No. 1:19-cv-10335-LTS<br><br>Oral Argument Requested |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO
<u>DISMISS THE CONSOLIDATED AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

    A.    Fidelity's FundsNetwork and the Infrastructure Fee. ............................ 2

    B.    Plaintiffs and the Plans ......................................................................... 4

    C.    Plaintiffs' Claims. .................................................................................. 4

LEGAL STANDARD ........................................................................................... 5

ARGUMENT ........................................................................................................ 6

I.     COUNTS I-IV FAIL AS A MATTER OF LAW BECAUSE FIDELITY OWES
      NO FIDUCIARY DUTY TO PLANS WHEN NEGOTIATING TO RECEIVE
      INFRASTRUCTURE FEES FROM MUTUAL FUND PROVIDERS. ........................... 7

    A.    Fidelity Was Not Acting as a Fiduciary When It Negotiated the
          Infrastructure Fees Because Platform Providers Are Not Fiduciaries for
          Purposes of Negotiating Their Own Compensation. ............................... 9

    B.    Fidelity's Control over the Universe of Funds Available on FundsNetwork
          Does Not Make It an ERISA Fiduciary for Any Purpose, Let Alone for
          Purposes of Negotiating Infrastructure Fees. ....................................... 12

    C.    Fidelity's Use of "Omnibus Accounts" Does Not Make It an ERISA
          Fiduciary for Any Purpose, Let Alone for Purposes of Negotiating
          Infrastructure Fees. .............................................................................. 15

    D.    Plaintiffs' Approach Would Be Detrimental to Retirement Savers. ..................... 16

II.    EVEN IF FIDELITY COULD BE DEEMED A FIDUCIARY, PLAINTIFFS'
      PROHIBITED TRANSACTION CLAIMS STILL WOULD FAIL. .............................. 17

III.   PLAINTIFFS' NON-FIDUCIARY CLAIM FAILS AS A MATTER OF LAW ........... 18

CONCLUSION .................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)................................................................ 5, 12

*Beddall v. State St. Bank & Tr. Co.,*
   137 F.3d 12 (1st Cir. 1998)........................................................ 6

*Central States, Se. & Sw. Areas Health & Welfare Fund v. Gerber Life Ins. Co.,*
   771 F.3d 150 (2d Cir. 2014) ..................................................... 19

*Columbia Air Servs., Inc. v. Fid. Mgmt. Trust Co.,*
   2008 WL 4457861 (D. Mass. 2008) ........................................... 8

*Danza v. Fid. Mgmt. Trust Co.,*
   533 F. App'x 120 (3d Cir. 2013) ............................................. 8, 9

*Donovan v. Bierwirth,*
   680 F.2d 263 (2d Cir. 1982) ..................................................... 17

*Dura Pharms., Inc. v. Broudo,*
   544 U.S. 336 (2005).................................................................... 6

*F.H. Krear & Co. v. Nineteen Named Trs.,*
   810 F.2d 1250 (2d Cir. 1987) ..................................................... 9

*Fifth-Third Bancorp v. Dudenhoeffer,*
   573 U.S. 409 (2014).................................................................... 6

*Fleming v. Fid. Mgmt. Trust Co.,*
   2017 WL 4225624 (D. Mass. Sept. 22, 2017) ................... passim

*Golden Star Inc. v. Mass Mut. Life Ins. Co.,*
   22 F. Supp. 3d 72 (D. Mass. 2014) ........................................... 13

*Great-W. Life & Annuity Ins. Co. v. Knudson,*
   534 U.S. 204 (2002).................................................................. 19

*Haddock v. Nationwide Financial Services, Inc.,*
   419 F. Supp. 2d 156 (D. Conn. 2006) ....................................... 15

*Hans v. Tharaldson,*
   2011 WL 7179644 (D.N.D. Oct. 31, 2011) .............................. 20

*Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.,*
   530 U.S. 238 (2000).................................................................. 20

**TABLE OF AUTHORITIES**

(Continued)

**Page(s)**

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) ........................................................................... passim

*In re Fid. ERISA Float Litig.*,
  829 F.3d 55 (1st Cir. 2016) ......................................................................... 8, 18

*Leber v. Citigroup, Inc.*,
  2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) .................................................. 18

*Leimkuehler v. Am. United Life Ins. Co.*,
  713 F.3d 905 (7th Cir. 2013) ........................................................................ passim

*Livick v. The Gillette Co.*,
  524 F.3d 24 (1st Cir. 2008) ............................................................................... 8

*Lockheed Corp. v. Spink*,
  517 U.S. 882 (1996) ......................................................................................... 20

*McCaffree Fin. Corp. v. Principal Life Ins. Co.*,
  811 F.3d 998 (8th Cir. 2016) ............................................................................. 9

*NLRB v. Amax Coal Co.*,
  453 U.S. 322 (1981) ......................................................................................... 18

*Pegram v. Herdrich*,
  530 U.S. 211 (2000) ........................................................................................... 7

*Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan
  Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013) ............................................................................... 6

*Renfro v. Unisys Corp.*,
  671 F.3d 314 (3d Cir. 2011) ................................................................. 8, 9, 14, 16

*Rozo v. Principal Life Ins. Co.*,
  344 F. Supp. 3d 1025 (S.D. Iowa 2018) ......................................................... 20

*Santomenno v. John Hancock Life Ins. Co. (USA)*,
  768 F.3d 284 (3d Cir. 2014) ............................................................... 9, 10, 12, 13

*Santomenno v. Transamerica Life Ins. Co.*,
  883 F.3d 833 (9th Cir. 2018) ........................................................................ passim

*Scott v. Aon Hewitt Fin. Advisors, LLC*,
  2018 WL 1384300 (N.D. Ill. Mar. 19, 2018) ................................................. 11

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Teets v. Great-W. Life & Annuity Ins. Co.*,
 286 F. Supp. 3d 1192 (D. Colo. 2017)..................................................................... 20

*Teets v. Great-W. Life & Annuity Ins. Co.*,
 921 F.3d 1200 (10th Cir. 2019) ................................................................... 9, 16, 19

*The Depot, Inc. v. Caring for Montanans, Inc.*,
 915 F.3d 643 (9th Cir. 2019) .......................................................................... 10

*Wood v. Prudential Ret. Ins. & Annuity Co.*,
 2016 WL 5940946 (D. Conn. Sept. 19, 2016) ............................................... 19

**Statutes**

29 U.S.C. § 1002(3) ......................................................................................... 5

29 U.S.C. § 1002(21)(A) ........................................................................... 5, 8, 16

29 U.S.C. § 1101(b)(1) ..................................................................................... 18

29 U.S.C. § 1104 ......................................................................................... 5, 7

29 U.S.C. § 1106(a) ................................................................................. 5, 7, 20

29 U.S.C. § 1106(b) ................................................................................. 5, 7, 17

29 U.S.C. § 1132(a)(3)........................................................................................ 19

**Other Authorities**

Carmen Germaine, *New Scrutiny on Platform Fees Raises Sub-TA Cost Questions*,
 Ignites.com (Mar. 14, 2019), http://tinyurl.com/yxnqpbzz........................................ 16

SEC Investor Bulletin: Mutual Fund Fees and Expenses (May 2014),
 https://www.sec.gov/files/ib_mutualfundfees.pdf .................................................. 11

## INTRODUCTION

This case is about whether Fidelity[1] is entitled to get paid for operating one of the largest mutual fund "supermarkets" in the industry.  Plaintiffs try to dress up their claims by repeatedly referencing "secret payments" or "secret kickback payments."  But, at the end of the day, the actual *facts* alleged in the Complaint establish nothing more than that Fidelity negotiated at arm's length a payment, which it calls an "infrastructure fee," from certain mutual fund managers to pay for the services required to make their funds available to investors on Fidelity's "FundsNetwork" investment platform.  That some of the many different kinds of investors who shop in this mutual fund "supermarket" are 401(k) plans and other ERISA-governed retirement plans does not change the fact that Fidelity is absolutely entitled to negotiate and collect these fees.  Indeed, for purposes of this motion, this case is no different than the numerous prior ERISA class actions brought against Fidelity in which plaintiffs have sought to hold Fidelity accountable for collecting similar fees.  *See* note 5, *infra* (citing cases).  In all of those cases, and in many similar cases brought against other service providers, courts have dismissed plaintiffs' claims, holding that there was nothing unlawful about the payments received.

The reason courts have reached this conclusion is simple:  The provisions of ERISA underlying plaintiffs' claims allow private parties to recover only for breaches of fiduciary duties (or "prohibited transactions," which are *per se* fiduciary breaches).  But where, as here, a platform or service provider negotiates its own compensation with an arm's length counterparty, it is not acting as a fiduciary to the 401(k) plans it services, or to any other investor.  Instead, it is necessarily acting in its own interests.  This is true irrespective of whether the fee is paid by the

---

[1] "Fidelity" as used in this memorandum refers to some or all of defendants FMR LLC; Fidelity Management & Research Company; Fidelity Management Trust Company; Fidelity Brokerage Services LLC; National Financial Services LLC; and Fidelity Investments Institutional Operations Company, Inc., and their affiliates.

plans and other investors, or by a third party like the mutual fund managers here; and it is true irrespective of whether the fee has been disclosed to the plans and other investors (although, in this case, the Complaint concedes that the infrastructure fees were, in fact, disclosed[2]).

This has to be the rule, because if service providers were deemed fiduciaries to 401(k) plans when negotiating their compensation, they would be required to negotiate with the "best interests" of the *plans* in mind, meaning that they could not charge the plans anything more than cost, and that they would have to agree to credit to the plans any excess compensation received from third parties. And, if that were the case, there would be no providers left in business.

In short, because nothing in ERISA prevents Fidelity from acting in its own interests when negotiating its compensation, plaintiffs' claims all fail as a matter of law, and their Complaint should be dismissed.

## **BACKGROUND**

### A.    Fidelity's FundsNetwork and the Infrastructure Fee.

FundsNetwork is among the largest "open architecture" investment platforms in the industry, connecting hundreds of asset management companies offering a total of over 10,000 mutual funds with all Fidelity investors and trillions in assets. *See* https://www.fidelity.com/ mutual-funds/overview (quoted in CAC ¶ 4). The investors who purchase mutual funds on FundsNetwork include individuals investing through personal brokerage accounts, individual retirement accounts, or college savings plans; large institutional investors investing on behalf of

---

[2] *See* Consolidated Amended Complaint ("CAC") ¶ 12 (citing two disclosures from Fidelity's public website, one of which is quoted as follows: "Fidelity may receive a fee from unaffiliated product providers to compensate Fidelity for maintaining the infrastructure to accommodate unaffiliated products [and] [t]he fee is a fixed amount that typically equates to less than 0.05% of a product provider's assets in all retail, workplace, and intermediary channels maintained by Fidelity, and does not vary based on a plan's offering of an unaffiliated product supported by Fidelity."). If this case proceeded to discovery, the evidence would show that Fidelity sent this same disclosure to more than 20,000 ERISA-governed plans.

their own clients; and, relevant here, employer-sponsored retirement plans governed by ERISA, for whom Fidelity serves as recordkeeper and trustee. *See id*.

Maintaining FundsNetwork is expensive.  In addition to the cost of developing and maintaining a state-of-the-art investment platform, Fidelity also provides administrative services to the mutual fund managers that participate in FundsNetwork—services that those companies have to perform themselves when they sell their funds directly, rather than through a platform like Fidelity's.  These services include, among other things, processing trades, tracking individual account balances, and distributing shareholder communications.  CAC ¶¶ 57-59, 99; *see, e.g.*, *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 909 (7th Cir. 2013) ( "the mutual fund would be furnishing" additional services "if it were not for" the service provider). In exchange for these services, Fidelity, like other platform providers, receives various forms of compensation from the mutual fund managers.  One common form of compensation is "revenue sharing," through which fund companies pay the provider a small percentage of the amount that plan investors have chosen to invest in the mutual fund managers' funds through the provider's platform. *Leimkuehler*, 713 F.3d at 909.  That revenue necessarily depends on and varies with investors' fund selections, and, as the Complaint concedes, it has substantially declined in recent years, as investors have increasingly directed their assets towards lower-cost, passive investment vehicles that do not provide revenue sharing to intermediaries like Fidelity.  CAC ¶ 12.

Plaintiffs allege that, to address this declining revenue, in 2017 Fidelity negotiated "infrastructure fees" with mutual fund managers that offer funds on FundsNetwork.  CAC ¶ 4. According to the Complaint, for any given mutual fund manager, the infrastructure fee is a fixed dollar payment negotiated with reference to the volume of assets under the mutual fund company's management, but is then offset by other revenue Fidelity receives from the fund

manager.  CAC ¶ 7.  For purposes of this motion only, Fidelity accepts that allegation as true.

**B.    Plaintiffs and the Plans.**

Plaintiffs are participants in several 401(k) and 403(b) retirement plans (the "Plans") offered by their employers (the "Plan Sponsors").  CAC ¶¶ 19-30.  The Plan Sponsors hired Fidelity to perform "recordkeeping" and other administrative services for the Plans under the terms of certain Service Agreements.  CAC ¶¶ 53, 54-55.[3]

Pursuant to the Service Agreements, Fidelity also provides the Plans with access to the wide range of investment options made available to investors through FundsNetwork.  CAC ¶ 4. From that broad menu of options, the Plan Sponsors—not Fidelity—select which investment options are made available to the Plans' participants.  *E.g.*, Ex. A Art. 8.01  (representative agreement stating that Fidelity "shall have no responsibility for the selection of Permissible Investments and shall not render investment advice to any person in connection with the selection of such options").  Plan participants like plaintiffs then choose how to allocate their retirement accounts into the investment options selected by the Plan Sponsors.  CAC ¶ 59. While Fidelity provides the Plan Sponsors and the Plans with access to the investment options available on FundsNetwork, it bears no responsibility for the Plan Sponsors' independent choice of which of those investment options to offer in the Plans.  *See* Ex. A Art. 8.01; Ex. B Art. II § 5.

**C.    Plaintiffs' Claims.**

The Complaint contains five counts attacking Fidelity's FundsNetwork infrastructure

---

[3] Plaintiffs allege in the Complaint that Fidelity enters into the same "standard form agreements with virtually all of the plans."  CAC ¶ 54; *see* CAC ¶ 111 (class action allegations stating that plaintiffs' claims "arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.").  The Declaration of Brian D. Boyle In Support of Defendants' Motion To Dismiss attaches excerpts from an exemplary set of Service Agreements between Fidelity and one of plaintiffs' plans.  This Court may properly consider the Service Agreements because they are referenced in the Complaint and integral to plaintiffs' claims.  *See* CAC ¶¶ 54-56; *infra* at 6.  All exhibit citations in this Memorandum refer to the exhibits attached to the Declaration of Brian D. Boyle.

- 4 -

fees.  Counts I and II assert that Fidelity was a fiduciary to the Plans, and that it engaged in "prohibited transactions" in violation of ERISA §§ 406(a), 406(b)(1)-(3) by negotiating the payment of infrastructure fees from third-party mutual fund managers.  CAC ¶¶ 117-38.  Count III asserts that Fidelity also breached its fiduciary duties of prudence and loyalty in violation of ERISA § 404(a)(1)(A)-(B).  CAC ¶¶ 140-43.  Count IV asserts that all defendants are liable for the above conduct as co-fiduciaries.  CAC ¶¶ 144-46.  Count V is the only count that does not turn on whether Fidelity is an ERISA fiduciary in these circumstances; it asserts, in the alternative, that Fidelity should be held liable as a "non-fiduciary" for knowingly participating in another party's fiduciary breach.  CAC ¶ 148.

## LEGAL STANDARD

ERISA is a federal statute that provides a comprehensive framework for the regulation of employee retirement plans.  29 U.S.C. § 1002(3).  ERISA imposes certain obligations on "plan fiduciaries," *i.e.*, the persons who exercise authority over the management and administration of a company's retirement plan and its assets.  *Id.* § 1002(21)(A).  Specifically, ERISA § 404(a) imposes a duty of loyalty, which requires a fiduciary to discharge its "duties with respect to a plan solely in the interest of the participants and beneficiaries," and a duty of prudence, which requires plan fiduciaries to act with the prudence someone "acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  *Id.* § 1104(a)(1)(A)-(B).  In addition, ERISA § 406(a) and (b) prohibit plan fiduciaries from causing ERISA plans to enter into certain "prohibited transactions" involving fiduciaries or other parties having an interest in the plan.  *Id.* § 1106(a)-(b).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).  The Supreme Court has made clear that motions to

dismiss are an "important mechanism for weeding out meritless [ERISA] claims." *Fifth-Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). This is particularly true in cases like this one, because "the prospect of discovery in a suit claiming breach of fiduciary duty is ominous, potentially exposing the ERISA fiduciary to probing and costly inquiries and document requests." *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013). As the Second Circuit has observed, "[t]his burden, though sometimes appropriate, elevates the possibility that 'a plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence.'" *Id.* (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). In order "to prevent [such] settlement extortion," courts presiding over ERISA cases like this one are careful to require that plaintiffs plead actual facts—and not just mere conclusions—that give rise to a plausible claim for relief. *Id.* (quotations omitted). In evaluating such claims, they will routinely consider plan- and fund-related documents and disclosures that are relevant to plaintiffs' claims, even if such documents are not "explicit[ly] reference[d]" in or attached to the complaint. *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 16-17 (1st Cir. 1998).

## ARGUMENT

Were this case to proceed to discovery, the evidence would undercut virtually all of plaintiffs' allegations. For example, it would show:

- that infrastructure fees were not calculated in the manner plaintiffs allege and unilaterally imposed by Fidelity, but that they were heavily negotiated with the fund managers;

- that the infrastructure fees covered services that primarily benefitted the mutual fund managers, and not plans or other investors;

- that most of Fidelity's customers who invest in funds sponsored by companies that pay

- 6 -

infrastructure fees are retail or institutional customers, and not Fidelity-recordkept retirement plans like those on whose behalf plaintiffs purport to sue;

- that infrastructure fees were not necessarily paid for out of the mutual funds' assets, but could be paid for out of the mutual fund managers' general accounts; and

- that the infrastructure fees were not a "secret," but rather disclosed to all investors.

This case should not proceed to discovery, however, because even accepting plaintiffs' false allegations as true, their claims fail as a matter of law. They fail because Fidelity does not act as a fiduciary when it negotiates or receives infrastructure fees from mutual fund managers, and they fail because plaintiffs have not pleaded any basis to recover from a non-fiduciary platform provider like Fidelity.

## I.   COUNTS I-IV FAIL AS A MATTER OF LAW BECAUSE FIDELITY OWES NO FIDUCIARY DUTY TO PLANS WHEN NEGOTIATING TO RECEIVE INFRASTRUCTURE FEES FROM MUTUAL FUND PROVIDERS.

Sections 404 and 406 of ERISA impose liability only on a "fiduciary" to a plan, and only for conduct undertaken in connection with his or her fiduciary duties. *See* 29 U.S.C. §§ 1104, 1106(a)-(b); *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). Thus, to establish their claims for imprudence and disloyalty under ERISA § 404(a) and for "prohibited transactions" under ERISA § 406, plaintiffs must establish not only that Fidelity is an ERISA fiduciary to the plans, but also that, in negotiating and collecting infrastructure fees from mutual fund managers, Fidelity was "acting" in its fiduciary capacity. As the Supreme court has put it, in "every case charging breach of ERISA fiduciary duty," the "threshold question" is "whether that person was acting as a fiduciary . . . *when taking the action subject to complaint*." *Pegram*, 530 U.S. at 226 (emphasis added). Because the facts alleged fail to meet this test, plaintiffs' claims should be dismissed.

As a matter of law, Fidelity can be deemed a fiduciary *only if* (and *only to the extent*) it takes on "discretionary authority or discretionary control respecting management of [an ERISA-

governed] plan" or "administration of such plan." 29 U.S.C. § 1002(21)(A).[4]  But Fidelity, like many recordkeepers, does not take on such a discretionary role, and is instead limited under the terms of the governing contracts to acting exclusively at the direction of the Plan Sponsors.  In other words, the Plan Sponsors direct Fidelity as to what investments from FundsNetwork to make available to Plan participants; Fidelity has no say in the matter.  *Supra* at 4.  Moreover, while a trustee may be deemed a fiduciary to the extent it "exercises any authority or control respecting management or disposition of [plan] assets," 29 U.S.C. § 1002(21)(A), the Service Agreements mandate that Fidelity "shall have no discretion or authority with respect to the investment of" plan assets and will act only pursuant to the "written direction" of the Plan sponsor or participants.  Ex. A Art. 20.04.  As the Third Circuit has explained in a similar case against Fidelity, no fiduciary obligations arise from such an arrangement.  *Renfro v. Unisys Corp.*, 671 F.3d 314, 323 (3d Cir. 2011).

Plaintiffs' Complaint posits several theories for why Fidelity's negotiation of infrastructure fees might give rise to fiduciary conduct.  But, as in every prior ERISA class action raising similar claims against plan service providers—including six cases against Fidelity[5]—plaintiffs' efforts ultimately fail.

---

[4] *See also Livick v. The Gillette Co.*, 524 F.3d 24, 29 (1st Cir. 2008) ("[A] party not identified as a plan fiduciary can become one if, but only to the extent that, he or she undertakes discretionary tasks related to the plan's management or administration.").

[5] *See In re Fid. ERISA Float Litig.*, 829 F.3d 55, 61-62 (1st Cir. 2016) (Fidelity not fiduciary because money paid from mutual funds to withdrawing participants is not "plan asset"); *Danza v. Fid. Mgmt. Trust Co.*, 533 F. App'x 120, 124 (3d Cir. 2013) (Fidelity not fiduciary in negotiating and receiving allegedly excessive fee for services from plan sponsor); *Renfro*, 671 F.3d at 324 (Fidelity not fiduciary with respect to composition of plan's investment lineup because plan sponsor, not Fidelity, controlled that lineup); *Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009) (Fidelity not liable as fiduciary for allegedly offering plan sponsor investment options with excessive fees and costs); *Fleming v. Fid. Mgmt. Trust Co.*, 2017 WL 4225624 (D. Mass. Sept. 22, 2017) (Fidelity not fiduciary with respect to allegedly excessive fees negotiated with third-party investment advisor or for allegedly excessive cost of investment options Fidelity offered on investment platform); *Columbia Air Servs., Inc. v. Fid. Mgmt. Trust Co.*, 2008 WL 4457861 (D. Mass. 2008) (Fidelity not fiduciary with respect to revenue sharing received from Fidelity-owned mutual funds).

A.   **Fidelity Was Not Acting as a Fiduciary When It Negotiated the Infrastructure Fees Because Platform Providers Are Not Fiduciaries for Purposes of Negotiating Their Own Compensation.**

Plaintiffs first contend that Fidelity is an ERISA fiduciary for purposes of the infrastructure fees because of its "discretion in negotiating/establishing its own compensation by and through its setting of the amount and receipt of the" infrastructure fee payments.  CAC ¶ 8. But courts have uniformly rejected the notion that a platform or other service provider acts as an ERISA fiduciary when negotiating—as opposed to unilaterally dictating—its own compensation. *Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1213 (10th Cir. 2019) ("A service provider . . . does not owe a fiduciary duty regarding its compensation when compensation is fixed during an arm's-length negotiation."); *Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 838 (9th Cir. 2018) ("*Transamerica*") ("A service provider is plainly not involved in plan management when negotiating its prospective fees[.]"); *McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1003 (8th Cir. 2016) ("Principal did not owe plan participants a fiduciary duty while negotiating the fee terms with McCaffree."); *Renfro*, 671 F.3d at 324 (service provider "owes no fiduciary duty with respect to the negotiation of its fee compensation"); *Santomenno v. John Hancock Life Ins. Co. (USA)*, 768 F.3d 284, 295 (3d Cir. 2014) (quoting *Renfro*); *Danza v. Fid. Mgmt. Trust Co.*, 533 F. App'x 120, 124 (3d Cir. 2013) ("[When] Fidelity was negotiating its fees with [the plan sponsor], it was not a fiduciary of the plan."); *Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009) ("a service provider does not act as a fiduciary with respect to the terms in the service agreement if it does not control the named fiduciary's negotiation and approval of those terms."); *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987) (similar).  This body of case law applies irrespective of whether the compensation for which the provider is negotiating will be paid by the plan or by a third party, as is the case here.  Indeed, three of the circuit court cases cited above addressed fees paid by third-

party mutual funds, rather than by the plan. *Hecker*, 556 F.3d at 583; *Transamerica*, 883 F.3d at 839; *Santomenno*, 768 F.3d at 292.

Plaintiffs' allegation that the infrastructure fees were "secret" and undisclosed to investors does nothing to distinguish this case law. As an initial matter, that conclusory allegation is directly contradicted by the Complaint itself, which cites and quotes several public disclosures about the infrastructure fees from Fidelity's website. *See supra* at 2 & n.2. (And, if this case were to proceed to discovery, the evidence would show that Fidelity sent this same disclosure to fiduciaries for more than 20,000 ERISA-governed plans, including each of the plaintiffs' plans.) But even if Fidelity had not disclosed its infrastructure fees to investors, that fact would be of no moment here. Courts have repeatedly held that a service provider does not become a fiduciary for purposes of setting its compensation simply because that compensation includes *undisclosed* payments from third-party mutual funds. Instead, the provider will continue to be treated as a non-fiduciary so long as plan sponsors are aware of the "bottom line cost of" available funds, and the plan sponsor remains free to select a different provider if the sponsor believes the provider's "investment options were too expensive." *Leimkuehler*, 713 F.3d at 912; *see also id.* at 910 ("Leimkuehler therefore knew how much each mutual fund cost, though he did not know how those costs were allocated between the fund companies and [the service provider]"); *Hecker*, 556 F.3d at 583-86 (holding Fidelity was not a fiduciary despite alleged non-disclosure of revenue-sharing payments, because the "total fee, not the internal, post-collection distribution of the fee, is the critical figure for someone interested in the cost of including a certain investment in her portfolio").[6] Because the Complaint does not, and could

---

[6] *See also The Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 655 & n.6 (9th Cir. 2019) (holding that insurance companies owed no fiduciary duty relating to alleged "hidden surcharges" because those surcharges were encompassed in total premium amounts that "were fully disclosed, and plaintiffs always remained free to walk away

not, allege either that plaintiffs' Plan Sponsors were unaware of the "bottom line cost of" the mutual funds in their Plan lineups,[7] or that they could not have selected a different platform provider if, in their view, FundsNetwork's "investment options were too expensive," *Leimkuehler*, 713 F.3d at 912, whether or not the infrastructure fees were disclosed is irrelevant to whether Fidelity can be held liable for a fiduciary breach.

Indeed, Judge Burroughs recently dismissed a very similar complaint against Fidelity raising allegations of undisclosed compensation from a third party:  In *Fleming v. Fidelity Mgmt. Trust Co.*, 2017 WL 4225624 (D. Mass. Sept. 22, 2017), plaintiffs claimed that Fidelity acted as a fiduciary when negotiating for allegedly excessive and undisclosed fees from Financial Engines ("FE"), a third-party investment adviser hired by the plan.[8]  The court reasoned that, given the well-settled law that service providers "are not acting in a fiduciary capacity when they negotiate with plan sponsors for their own compensation," "it is difficult to see how a service provider could be an ERISA fiduciary when it negotiates a fixed rate of compensation from an entity other than the Plan."  *Id.* at *7.  The court did not even discuss plaintiffs' allegation that Fidelity's compensation from FE was undisclosed to the plan, because it was irrelevant:  Fidelity did not control either the plan's decision to hire FE or FE's decision to agree to pay Fidelity a certain rate of compensation, so Fidelity was not acting as a plan fiduciary when negotiating its compensation from FE.  *Id.*; *see also Scott v. Aon Hewitt Fin. Advisors, LLC*, 2018 WL 1384300,

---

and select another insurance company," and "the fact that defendants did not disclose the composition of the premiums . . . does not mean that defendants exercised discretion in setting them").

[7] Here, the "bottom line cost" of each mutual fund, *Leimkuehler*, 713 F.3d at 912—also known as the mutual fund's "expense ratio"—must be disclosed in each fund's prospectus, and plaintiffs do not, and could not, allege that the Plan Sponsors were unaware of it. *See, e.g.*, SEC Investor Bulletin: Mutual Fund Fees and Expenses (May 2014), https://www.sec.gov/files/ib_mutualfundfees.pdf.

[8] *See Fleming*, Pltfs.' Opp. to Mot. to Dismiss, at *15 n.7 (arguing "details of the compensation agreement between Fidelity and" FE were not "disclosed to the Delta Plan"); *id.* at *16 ("Fidelity was a fiduciary in connection with the retention of [FE] because [it] controlled that retention and the undisclosed compensation it received …").

at *5 (N.D. Ill. Mar. 19, 2018) (dismissing claim materially identical to claim in *Fleming*).  The same holds true here:  Fidelity has negotiated to receive from third-party fund managers a fixed and determined amount of compensation, in the form of infrastructure fees, and Fidelity has no authority to unilaterally change that compensation.  *See* CAC ¶¶ 5, 7.[9]  Accordingly, Fidelity is not a fiduciary when it negotiates and receives such fees.[10]

**B.     Fidelity's Control over the Universe of Funds Available on FundsNetwork Does Not Make It an ERISA Fiduciary for Any Purpose, Let Alone for Purposes of Negotiating Infrastructure Fees.**

Plaintiffs' Complaint also suggests that Fidelity is an ERISA fiduciary because it has the ability to add or delete mutual funds from the broad menu of more than 10,000 funds available on FundsNetwork.  *See, e.g.*, CAC ¶¶ 69, 119.  This time-worn theory of fiduciary status also fails because, as numerous courts have held, having control over the menu of investment options from which plan sponsors may choose their plan's lineup does not transform a platform provider into a functional fiduciary.  *Santomenno*, 768 F.3d at 295, *Leimkuehler*, 713 F.3d at 911.

Fidelity's choice of which funds to make available to the Plans and other investors through FundsNetwork is a quintessential "product design" decision that courts have uniformly

---

[9] In paragraph 12 of the Complaint, plaintiffs conclusorily allege that Fidelity "reserves the right to increase the amount of the [infrastructure fee] payments and to impose them upon mutual funds at its discretion."  CAC ¶ 12; *see also* CAC ¶ 75.  But plaintiffs provide absolutely no concrete factual allegations to support this naked conclusion— to the contrary, elsewhere in the Complaint plaintiffs repeatedly acknowledge, as common sense dictates, that Fidelity "negotiates" with mutual fund managers for the infrastructure fee payments.  CAC ¶¶ 8, 68, 83, 106; *see Iqbal*, 556 U.S. at 679 (courts assessing motions to dismiss must draw on "judicial experience and common sense").

[10] Plaintiffs dispute whether Fidelity's disclosure of the infrastructure fees is sufficient to satisfy ERISA § 406(a) and 29 C.F.R. § 2550-408b-2, which require plan service providers to disclose to plan sponsors all compensation earned "in connection with" services provided to plans.  *See* CAC ¶ 135.  Fidelity maintains that the infrastructure fees are not required to be disclosed under the 408b-2 regulation, because they are fixed-dollar fees received from mutual fund managers in connection with the services Fidelity provides to those companies—they are not earned "in connection with" the services that Fidelity provides to the plans.  Nonetheless, as noted above, Fidelity has always disclosed the infrastructure fees to its ERISA-governed plan clients.  And, in any event, a service provider's failure to comply with 408(b)(2)'s disclosure requirements does not give rise to a private right of action for fiduciary breach, where, as here, the provider is not acting as a fiduciary to the plans in negotiating or receiving the undisclosed compensation.  *See supra* at 4 (fiduciary status is an element of Counts I-IV).

deemed *non*-fiduciary in nature.  As the Seventh Circuit explained in *Leimkuehler*, "selecting which funds will be included in a particular 401(k) investment product, without more, does not give rise to fiduciary responsibility" if the plan fiduciary retains "the final say on which investment options will be included" in the plan's lineup.  713 F.3d at 911 (quotation omitted). Several other courts have also addressed cases just like this one, where the defendant offers a broad platform of investment options, from which plan sponsors can choose a smaller group of options to make available in their plan.  *See Santomenno*, 768 F.3d at 289 ("Notwithstanding John Hancock's authority over the construction of the Big Menu and its selection of share classes, the trustees retained the responsibility for selecting investment options for inclusion in the Small Menu and for offering to Participants."); *see also Leimkuehler*, 713 F.3d at 912 ("[T]he act of selecting both funds and their share classes for inclusion on a menu of investment options offered to 401(k) plan customers does not transform [an investment provider] into a functional fiduciary."); *Hecker,* 556 F.3d at 583-84; *Transamerica*, 883 F.3d at 839.  As these courts explain, because the plan sponsor picks the "Small Menu" of investment options, and is also "free to seek a better deal with a different 401(k) service provider" if it does not like the provider's "Big Menu" of investment options (or the fees associated with them), it is the plan sponsor—and not the service provider—that bears fiduciary responsibility for the plan's choice of investments.  *Leimkuehler*, 713 F.3d at 912; *see Santomenno*, 768 F.3d at 293-94; *Hecker*, 556 F.3d at 583; *Transamerica*, 883 F.3d at 839; *Golden Star Inc. v. Mass Mut. Life Ins. Co.*, 22 F. Supp. 3d 72, 83 (D. Mass. 2014).

The same reasoning applies here: the Service Agreements confirm that the Plan Sponsors—not Fidelity—retain sole responsibility for choosing which of the more than 10,000 investment options offered through FundsNetwork to include in the Plans' investment lineups.

*See* Ex. A Art. 8.01 (Fidelity "shall have no responsibility for the selection of Permissible Investments"); Ex. B Art. II § 5 (Fidelity Service Agreement confirming same).  For this reason, three courts have rejected similar efforts to label Fidelity a functional fiduciary.  In *Hecker*, the Seventh Circuit held that Fidelity's role in deciding which options to offer on its platform did not transform it into a functional fiduciary, so long as the plan fiduciaries "had ultimate authority over the selection of funds" from the platform.  556 F.3d at 584.  In *Renfro*, the court similarly rejected a claim that Fidelity owed fiduciary duties with respect to the composition of a plan's investment lineup because the plan sponsor, not Fidelity, had the "contractual authority to control the mix and range of investment options" offered in the plan.  671 F.3d at 323.  And most recently, in *Fleming*, the court rejected arguments that Fidelity was a fiduciary when it chose which funds to include in a different platform called "BrokerageLink," reasoning once again that plan sponsors' ultimate authority to decide whether or not to offer BrokerageLink to the plan rendered them (and only them) the responsible fiduciaries.  2017 WL 4225624, at *5.

Plaintiffs allege that Fidelity "maintains complete discretion to substitute, eliminate and add mutual funds offered through its FundsNetwork" and that "Fidelity has exercised" that discretion."  CAC ¶ 69.[11]  But those allegations do not distinguish *Hecker, Renfro*, *Fleming*, or any of the other cases cited above, because Fidelity and other platform providers always have general control of the broad menu of available investments.  Notably, the Complaint does not allege that Fidelity has ever removed any mutual fund from FundsNetwork that was included in the investment lineup for any plan recordkept by Fidelity, let alone the eleven named plaintiffs'

---

[11] The public record makes clear that Fidelity does not, in fact, perform any significant curation of the investment options available on FundsNetwork.  To the contrary, in its 2013 decision in *Leimkuehler*, the Seventh Circuit noted that, at that time there were "roughly 7,500 mutual funds currently available on the market," 713 F.3d at 909, and, only a few years later, Fidelity's FundsNetwork offers more than 10,000 mutual funds to its customers.  *Supra* at 2.

Plans.  Nor could plaintiffs have made such an allegation: the Service Agreements set forth the

specific investment options selected by the Plan Sponsors that Fidelity must make available to

the Plans, and Fidelity is prohibited from unilaterally amending those agreements (including the

investment options specified therein) unless such an amendment is required "to comply with then

current law, or to update services and procedures."  Ex. B Art. II § 12; *see id.* at p. 30 (similar).

In other words, while Fidelity may generally have discretion to decide whether to add, maintain

or remove a mutual fund from its FundsNetwork platform, Plaintiffs have not alleged (and could

not allege) any facts to suggest that Fidelity is free to exercise that discretion where a fund has

been selected by one or more Plan Sponsors for inclusion in their Plan's investment lineup.  And,

absent specific factual allegations that Fidelity could unilaterally remove or alter the investment

options actually offered in the Plans, this case is no different than *Hecker*, *Renfro* and *Fleming*.[12]

### C.    Fidelity's Use of "Omnibus Accounts" Does Not Make It an ERISA Fiduciary for Any Purpose, Let Alone for Purposes of Negotiating Infrastructure Fees.

Courts have squarely held that fees like the infrastructure fees, which are paid to Fidelity

by mutual funds or their managers, are not "plan assets."  *See, e.g., Fleming*, 2017 WL 4225624,

at *9 ("the fees that Defendants collect from the mutual funds . . . are not 'assets of the plan"

within the meaning of ERISA."); *see also infra* at 17-18.  Nonetheless, the Complaint appears to

suggest that Fidelity can be deemed a fiduciary for purposes of the infrastructure fees because of

---

[12] Plaintiffs appear to have crafted their complaint to mirror, as much as possible, the allegations in *Haddock v. Nationwide Financial Services, Inc.*, 419 F. Supp. 2d 156 (D. Conn. 2006), an outlier decision finding that an insurance company took on fiduciary status when designing its investment platform and product menu.  Indeed, plaintiffs go so far as to deploy specialized terms used in that opinion—such as "accumulation units," *e.g.*, CAC ¶ 58—that are unique to the insurance accounting context and have no applicability here.  It is no matter.  As the Seventh Circuit has explained, *Haddock* turned on the fact that the service provider there "had the authority to delete and substitute mutual funds from the plan *without seeking approval* from the named fiduciary."  *Hecker*, 556 F.3d at 584 (emphasis added); *see also Fleming*, 2017 WL 4225624, at *6 (distinguishing *Haddock* on the same basis).  No court has interpreted *Haddock* to suggest that fiduciary status can arise where, as here, the defendant has no unilateral authority to change the investments chosen by the plan sponsor for a plan's lineup.

its "discretionary control" over the "management or disposition of [plan] assets." 29 U.S.C. § 1002(21)(A). More specifically, plaintiffs allege that (1) Fidelity purportedly controls "Omnibus Accounts" in which it deposits funds to be used to purchase mutual fund shares on the plans' behalf, *see* CAC ¶¶ 57-68; (2) the funds in these "Omnibus Accounts" (which plaintiffs claim are divided into "accumulation units"[13]) are plan assets, CAC ¶ 59; and (3) Fidelity breaches fiduciary duties to the Plans by delivering those "plan assets" to mutual funds in order to secure infrastructure fee payments, CAC ¶ 66; *see also id.* ¶ 119.

This argument fails, however, because plaintiffs do not (and could not) allege that Fidelity fails to follow the instructions it receives from Plan Sponsors and participants about how to invest their money. There is no allegation, for example, that Fidelity ignores the fund selections made by Plan Sponsors or participants and, instead, improperly re-directs their investments through these Omnibus Accounts to mutual funds managed by companies that pay infrastructure fees. Where, as here, a "directed trustee" like Fidelity simply follows the directions provided to it, it does not engage in fiduciary conduct. *See Teets*, 921 F.3d at 1213 ("Fiduciary status turns on whether the service provider can force plans or participants to accept its choices about plan management or assets."); *Renfro*, 671 F.3d at 323; *see also supra* at 8.

### D.     Plaintiffs' Approach Would Be Detrimental to Retirement Savers.

There are also compelling practical reasons to reject plaintiffs' theories of fiduciary status. As is clear from the public record, retirement plan service providers operate at increasingly thin margins, and to continue in business they must negotiate arrangements that allow them some amount of profit.[14] If a fiduciary duty applied to compensation negotiations,

---

[13] *See supra* n.12 (noting that this inapposite term appears to be wrenched from the *Haddock* decision).

[14] Carmen Germaine, *New Scrutiny on Platform Fees Raises Sub-TA Cost Questions*, Ignites.com (Mar. 14, 2019), http://tinyurl.com/yxnqpbzz ("[T]he question of who pays becomes more pressing as shares with stripped-down fee

that profit motive would presumably violate ERISA, which prohibits plan fiduciaries from acting

other than in the exclusive interest of plan participants.  *See Donovan v. Bierwirth*, 680 F.2d 263,

271 (2d Cir. 1982) (ERISA § 404(a)'s duty of loyalty requires a fiduciary to act "with an eye

single to the interests of the participants and beneficiaries" of a plan).  In other words, if

plaintiffs' view of fiduciary status were correct, then service providers like Fidelity could not

profit from the services they provide to plans:  They could not charge the plans anything more

than cost; and they would have to agree to credit to the plans any excess compensation received

from third parties.  And, if that were the case, there would be no service providers left in

business.  Courts have rightly avoided such an "absurd result[]."  *Transamerica*, 883 F.3d at 838.

*     *     *

In short, Fidelity is not a fiduciary when negotiating and receiving infrastructure fees, and

plaintiffs' fiduciary breach and prohibited transaction claims in Counts I-III, and Count IV for

co-fiduciary liability, therefore fail as a matter of law.

## II.   EVEN IF FIDELITY COULD BE DEEMED A FIDUCIARY, PLAINTIFFS' PROHIBITED TRANSACTION CLAIMS STILL WOULD FAIL.

Even assuming that Fidelity could be deemed a fiduciary with respect to negotiating

infrastructure fees (and it cannot), plaintiffs' "prohibited transaction" claims under ERISA

§ 406(b)(1) and ERISA § 406(b)(2) would still require dismissal.

First, plaintiffs' claim under ERISA § 406(b)(1) would still fail because, as the

Complaint concedes, such a claim requires a showing that the fiduciary was "deal[ing] with the

assets of the plan in [its] own interest or for [its] own account."  29 U.S.C. § 1106(b)(1); *see*

---

structures, such as institutional and R6 classes, dominate sales.  Whereas with traditional retail share classes, 12b-1 fees and certain operational expenses paid to intermediaries were baked in to share prices, many 'clean' shares have no such accommodation.").

CAC ¶ 123.  But a mutual fund's assets are not "plan assets" for purposes of ERISA.  *See* 29 U.S.C. § 1101(b)(1) ("In the case of a plan which invests in any security issued by a [mutual fund], the assets of such plan shall be deemed to include such security, but shall not, solely by reason of such investment, be deemed to include any assets of such [mutual fund]."); *In re Fid. ERISA Float Litig.*, 829 F.3d 55, 61-62 (1st Cir. 2016) (same).  Accordingly, where, as here, plaintiffs have challenged the propriety of payments made by mutual funds to service providers, courts have consistently held that such payments do not involve "plan assets," and, thus, cannot give rise to a claim under ERISA § 406(b)(1).  *See, e.g., Hecker*, 556 F.3d at 584 ("The fees were drawn from the assets of the mutual funds in question, which, as the statute provides, are not assets of the Plans."); *Transamerica*, 883 F.3d at 839 (same).

Second, plaintiffs' ERISA § 406(b)(2) claim would still fail because that claim requires a showing that, in negotiating infrastructure fees, Fidelity was "acting on behalf of third parties which have interests that are adverse to those of the Plans, their participants and/or beneficiaries in connection with transactions involving the Plans."  CAC ¶ 124.  Section 406(b)(2) is designed to prevent a fiduciary "from being put into a position where he has dual loyalties, and therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries."  *NLRB v. Amax Coal Co.*, 453 U.S. 322, 333-34 (1981).  Here, plaintiffs do not identify any "third party" whose interests Fidelity was seeking to promote when negotiating infrastructure fees.  Nor could they have done so, as Fidelity clearly was seeking to promote its own interests when negotiating these fees from the mutual fund managers.  Accordingly, Plaintiffs' § 406(b)(2) claim should be dismissed.  *See, e.g.*, *Leber v. Citigroup, Inc.*, 2010 WL 935442, at *12 (S.D.N.Y. Mar. 16, 2010) (dismissing § 406(b)(2) claim for similar pleading failure).

## III.    PLAINTIFFS' NON-FIDUCIARY CLAIM FAILS AS A MATTER OF LAW.

The Complaint alleges in a single conclusory paragraph (indeed, a single conclusory

sentence) that, in the event Fidelity is not deemed a fiduciary, the Court should hold it liable "for all recoverable losses and relief as a party-in-interest or other non-fiduciary that knowingly participated in prohibited transactions and breaches of fiduciary duty in violation of ERISA." CAC ¶ 148.  This "non-fiduciary" claim fails for two reasons.

First, the Supreme Court has made clear that, unlike claims against ERISA fiduciaries, claims against *non*-fiduciaries may seek only "appropriate equitable relief."  29 U.S.C. § 1132(a)(3); *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209-10 (2002).  Yet plaintiffs seek "recoverable losses" in their non-fiduciary claim, CAC ¶ 148, and such monetary damages "are, of course, the classic form of legal relief."  *Knudson*, 534 U.S. at 210 (quotations omitted) (holding that suits seeking "to compel [a non-fiduciary] defendant to pay a sum of money to the plaintiffs" are "[a]lmost invariably" inappropriate).  Plaintiffs may recover monetary relief on a claim for non-fiduciary liability only if the "money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession."  *Id.* at 213; *see Teets*, 921 F.3d at 1223 (plaintiffs must identify "a specific *res* from which they seek to recover").  Plaintiffs do not (and could not) allege that such tracing is possible here.  Instead, the Complaint confirms that plaintiffs are seeking compensatory damages in an amount equal to the sum of money paid from the mutual fund managers' general accounts into Fidelity's general accounts as infrastructure fees.  *E.g.*, CAC ¶ 18.  Plaintiffs' requested monetary remedies are therefore *legal* remedies barred under ERISA § 502(a)(3).[15]

---

[15] *See Wood v. Prudential Ret. Ins. & Annuity Co.*, 2016 WL 5940946, at *5 (D. Conn. Sept. 19, 2016) (dismissing claim against non-fiduciary for disgorgement of "undisclosed, excessive, and unreasonable compensation" as improper request for "legal relief"); *Central States, Se. & Sw. Areas Health & Welfare Fund v. Gerber Life Ins. Co.*, 771 F.3d 150, 154-55 (2d Cir. 2014) (dismissing "injunctive" claims for payment of money by a non-fiduciary, because they were "legal [claims] for money damages even though they are covered by an equitable label").

Second, plaintiffs' non-fiduciary claim fails to comply with basic pleading requirements. The Complaint does not identify who the allegedly breaching "fiduciary" is, let alone how that fiduciary "caused" an ERISA violation, as required to state a claim under ERISA § 406(a).  *See Fleming*, 2017 WL 4225624, at *8.  Nor could it have made such an allegation:  The infrastructure fee payments about which plaintiffs complain are negotiated between Fidelity and third-party mutual fund managers and do not involve any Plan fiduciaries.  Moreover, to establish liability against a *non-fiduciary* for participation in an ERISA prohibited transaction, the non-fiduciary "must be demonstrated to have had actual or constructive knowledge of the circumstances that rendered the transaction unlawful."  *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 251 (2000).[16]  Yet the Complaint contains no factual allegations from which one could plausibly infer that Fidelity knowingly participated in any Plan fiduciary's ERISA violation.  Indeed, the Complaint does not contain a single allegation that Fidelity took *any* action despite knowing it was participating in another party's breach of ERISA.[17]  For each of these reasons, Count V should be dismissed.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

---

[16] In other words, plaintiffs must demonstrate that the non-fiduciary engaged in some transaction with knowledge that the other party to the transaction *was violating ERISA.  See, e.g., Teets v. Great-W. Life & Annuity Ins. Co.*, 286 F. Supp. 3d 1192, 1208-09 (D. Colo. 2017) (non-fiduciary liability requires "not just knowledge of the underlying facts, but knowledge of their potential unlawfulness," meaning a plaintiff must show "defendant knew or should have known that the transaction violated ERISA"); *Rozo v. Principal Life Ins. Co.*, 344 F. Supp. 3d 1025, 1037-38 (S.D. Iowa 2018); *Hans v. Tharaldson*, 2011 WL 7179644, at *16 (D.N.D. Oct. 31, 2011).

[17] Further, plaintiffs have not, for example, alleged any facts demonstrating that Fidelity knowingly participated in a transaction wherein a "fiduciary . . . cause[d] the plan to engage in a transaction," and where that fiduciary "knows or should know" that the transaction will constitute a "furnishing of goods, services, or facilities between the plan and a party in interest" that is unsheltered by any ERISA exemption.  29 U.S.C. § 1106(a)(1)(C); *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996) (Section 406(a)(1)(C) safeguards against "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length").

Dated:  July 1, 2019                     Respectfully submitted,


                                         /s/ Brian D. Boyle
                                         Gregory F. Jacob (*pro hac vice*)
                                         Brian D. Boyle (*pro hac vice*)
                                         Bradley N. Garcia (*pro hac vice*)
                                         O'MELVENY & MYERS LLP
                                         1625 Eye Street
                                         Washington, DC 20006
                                         Telephone:    (202) 383-5300
                                         Facsimile:    (202) 383-5414

                                         John J. Falvey (BBO# 542674)
                                         Goodwin Procter LLP
                                         100 Northern Avenue
                                         Boston, MA 02210
                                         Telephone:    (617) 570-1000
                                         Facsimile:    (617) 523-1231

                                         *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on July 1, 2019.

*/s/ Brian D. Boyle*
Brian D. Boyle (*pro hac vice*)
